983 So.2d 810 (2008)
STATE of Louisiana
v.
LaDerrick CAMPBELL.
No. 2006-KA-0286.
Supreme Court of Louisiana.
May 21, 2008.
Rehearing Denied June 27, 2008.
*815 Capital Appeals Project, Jelpi Pierre Picou, Jr., G. Benjamin Cohen, Aneel Lachman Chablani, New Orleans, Counsel for Appellant.
James D. Caldwell, Attorney General, Paul Carmouche, District Attorney, Brady Dennis O'Callaghan, Catherine Marion Estopinal, Edward M. Brossette, Assistant District Attorneys, for Appellee.
TRAYLOR, Justice.
On March 14, 2002, a Caddo Parish grand jury indicted the defendant, LaDerrick[1] Campbell, for the February 11, 2002 *816 first degree murder of Kathy Parker, in violation of La. R.S. 14:30. Trial commenced with jury selection on September 13, 2004. On September 22, 2004, the jury returned a unanimous verdict of guilty as charged. After a penalty phase hearing, the same jury unanimously recommended a sentence of death after finding as an aggravating circumstance that the defendant was engaged in the perpetration of an armed robbery when he murdered the victim. On February 25, 2005, after denying post-verdict motions, the trial court imposed the sentence of death in accordance with the jury's verdict.
The defendant now brings the direct appeal of his conviction and sentence to this court pursuant to La. Const. art. 5, § 5(D).[2] For the reasons that follow, we find that none of the arguments put forth constitute reversible error, and affirm the defendant's conviction and sentence.

TRIAL PROCEEDINGS
As will be discussed in more detail later in this opinion, during the fifth day of jury selection, the defendant requested that he be permitted to waive appointed counsel and represent himself for the remainder of voir dire and during trial. After a full Faretta colloquy, and a hearing closed to the state, the trial court granted the defendant's request and allowed him to represent himself. The following day, the defendant conducted the remainder of voir dire and a jury was selected. Trial began on September 20, 2004.
The state relied upon testimonial and physical evidence, including a video surveillance tape, to show that on the evening of February 11, 2002, shortly after 9:00 p.m., the defendant and James Washington entered the Magnolia Liquor Club (hereinafter "Magnolia Club") in Rodessa, Louisiana.[3] The defendant entered first, armed with a shotgun. Washington entered the Magnolia Club immediately behind the defendant. The defendant approached the store's counter, immediately to his right, and demanded that the victim, Kathy Parker, a Magnolia Club employee, give him all of the money in the register. The victim complied, and while cowering behind the counter, begged the defendant not to shoot her. The defendant shot the victim once in the chest. Both the defendant and Washington immediately exited the Magnolia Club and entered a waiting vehicle which then sped away.
At trial, Ovid Melvin Parker, Jr., the victim's husband, testified that he was at the Magnolia Club with his wife on the night of her murder. Parker identified a diagram of the Magnolia Club and explained that the club was both a package liquor store and a bar. Parker placed the victim at the time of the shooting as behind the counter, at the cash register closest to the front door of the Magnolia Club. Parker also confirmed that the Magnolia Club had video surveillance equipment operating on the night of the murder which captured an accurate representation of the events of February 11, 2002. The defendant did not cross-examine Parker.
Cardell Jackson testified that he grew up in Rodessa, Louisiana, a very small town. He was present at the Magnolia *817 Club on the evening of February 11, 2002, sitting at one of the video poker machines near the entrance closest to the door. Jackson recognized James Washington as Washington entered the Magnolia Club, after Washington looked him "straight in the face," and he recognized the defendant's voice after hearing the defendant speak. Jackson heard the victim say "I'll give you anything you wantdon't shoot me" and he heard the defendant say "give me all the money, the money out the other cash register, too." He estimated that he was probably four feet from Washington and the defendant when he heard the defendant ordering the victim to give him the money. Jackson heard the gunshot but did not see the shooting.
Jackson did not recall seeing a weapon, but from his vantage point at a video poker machine, he saw someone make a motion as if he had a weapon and was pointing at the victim. Jackson then explained that he was able to identify both the defendant and Washington because they are both from Rodessa, he has known them both since they were small children, and he was friends with their families.
On cross-examination, Jackson agreed that music was playing in the club that night. Jackson also admitted that in his initial statement to police, he denied seeing anything. He then explained that he got in touch with a detective and told the detective that he saw Washington in the club and heard the defendant's voice. Upon prompting by the defendant, Jackson admitted again that he did not see the defendant's face, but only heard his voice. Jackson explained, however, that he saw, in general, the features of the shooter and as a result "I saw something about him that I knew it was LaDerrick Campbell." Jackson admitted to having glaucoma and that he did not have 20-20 vision.
On redirect, Jackson explained that he initially failed to report to police what he saw that night because "[t]hese young men, they had already taken a life. They know where I lived, they know where my family live, they know where my children live, they know where my grandchildren live and I was scared and I didn't know which way they had went." Jackson confirmed that he did not see Washington with a gun that night. On recross, the defendant elicited from Jackson that Jackson had been drinking beer that night, and that noise was being made by both the video poker machines and music being played on the jukebox throughout the encounter.
Sandy Neighbors testified that she was at the Magnolia Club on the night of February 11, 2002. She was in the women's bathroom when she heard a loud noise and then heard a lady say "don't shoot." She did not see the defendant or Washington. The defendant elected not to cross-examine Neighbors.
Dennis Duree was also at the Magnolia Club on the night of February 11, 2002. He was standing next to the juke box when he saw the defendant, along with a shorter man at the counter. Duree recalled that the shooter was wearing a white shirt. Duree admitted that he did not get a very good look at the defendant; rather, he just saw his profile. Duree testified that he heard the defendant tell the victim to give him the money and the victim replied that she would give him everything she had. At that point, Duree stepped back from the juke box in an attempt to see the events unfolding at the counter. He could not see the victim, who was crouched behind the counter, but he heard her say "please don't shoot me, please don't kill me." Duree turned and headed to the farther end of the bar, and then heard a shot.
*818 On cross-examination, the defendant elicited testimony from Duree that music was playing on the juke box when he heard the victim beg for her life. Duree also admitted that he was not 100% sure that the shooter was the defendant.
Roger Rhyne was also at the Magnolia Club on the night of the shooting. Rhyne was at the pool table when he saw a tall black man with what looked like black mesh on his head enter the Magnolia Club, carrying a shotgun. Rhyne heard the victim say in a high-pitched voice, "[d]on't kill me" and "[w]hatever you want, just please don't kill me." The man carrying the gun was standing at the counter and raised up so that he could shoot the victim behind the counter where she had fallen on her knees. Because he did not have his glasses on, Rhyne was unable to see the shooter clearly. The defendant did not cross-examine Rhyne.
Also at the Magnolia Club on February 11, 2002, was Barbara Forte. At trial, Forte testified that she had been playing video poker and drinking that night and approached the victim at the counter to get change when two black men came into the store and also approached the counter. Forte moved away to return to her seat, thinking the two men were customers and that she would wait until they were finished. One man was tall and one man was short. She recalled that the tall one was yelling, "this is a holdup. Don't nobody move." Forte remembered one of the men ordering the victim to open the cash register. She heard the victim say "You can have anything I got, just don't shoot me." Forte did not hear a gunshot but rather heard a sound that sounded like "somebody hit up against something real hard." Forte was unable to identify the perpetrators.
On cross-examination, Forte explained that she was 100% sure that the taller of the two men who entered the club was wearing a long coat, but that she could not make a positive identification of either of the men.
Detective Charles Bradford of the Caddo Parish Sheriff's Office testified that he was assigned to investigate the murder of Kathy Parker on February 11, 2002 at the Magnolia Club. He conducted witness interviews and collected information when he arrived on the scene that evening. He also viewed the club's surveillance videotape and concluded that "after I viewed the tape of both individuals going into the store and then as they exited the store it appeared that I did recognize both individuals. Like I stated in my report, they had similar features to two subjects that I've known for a while." Detective Bradford identified the suspects as James Washington and LaDerrick Campbell. After an investigation and obtaining an arrest warrant, the defendant and Washington were arrested at the same house in Cass County, Texas. After waiving extradition, the pair was returned to Louisiana and Detective Bradford conducted an interview of Washington. Detective Bradford explained that after he informed Washington of his constitutional rights, Washington waived them and admitted to taking part in the robbery of the Magnolia Club and the shooting. Washington stated that he knew where the shotgun used in the shooting was hidden and that he was willing to take police to it. Washington took police to the gun, which Detective Bradford identified in court.
The defendant cross-examined Detective Bradford and attempted to undermine the officer's initial identification of the defendant from his viewing of the videotape. Detective Bradford admitted that the recovered shotgun did not have any identifiable fingerprints. He also admitted that the car used by the two men to flee the *819 scene of the robbery and shooting was not examined for fingerprints.
Sgt. Owen McDonnell of the crime scene investigation division of the Caddo Parish Sheriff's Office, testified as to how he captured the individual images of the Magnolia Club's surveillance camera onto a second tape, which was shown to the jury. Sgt. McDonnell testified the original surveillance tapes captured images from four separate cameras set up at different angles in the Magnolia Club and that the videotape he made for the jury contained only the images recorded from approximately 9 p.m. on February 11, 2002, the time frame immediately preceding when the persons entered the Magnolia Club to perpetrate the armed robbery and shooting, and for a short time after.
In addition to copying the surveillance videotape which was played for the jury, Sgt. McDonnell examined the weapon believed to be used in the shooting. At the time he examined the weapon, Sgt. McDonnell noted that the 12-gauge shotgun still had a shotgun shell inside the chamber. In other words, the weapon had not expelled the spent shell when it was fired. Sgt. McDonnell testified that no identifiable fingerprints were recovered from the shotgun or found in the Magnolia Club.
On cross-examination, the defendant had Sgt. McDonnell reiterate the point that no fingerprints were found in the investigation of this matter which pertained to him.
Richard Beighley, a criminalist at the North Louisiana Crime Lab in Shreveport, qualified without objection as an expert in firearms identification. Beighley testified that he examined the shotgun identified as the murder weapon. The gun operated normally when Beighley conducted a test fire and had a functional safety mechanism. The victim's clothes were also examined. Based upon the type of gun recovered and the holes in the victim's shirt, Beighley gave his opinion that the evidence was consistent with a shot being fired from a distance of two to five feet. Beighley also testified that the single-action trigger pull on the shotgun was 7.68 pounds, meaning a person would have to apply that much force on the trigger to fire the weapon. By contrast, a "light trigger" or a "hair trigger" would only require under three pounds. Beighley's expert report was introduced into evidence without objection from the defendant.
When asked by the court if he intended to cross-examine Beighley, the defendant replied, "Your Honor, I don't have any questions because he didn't receive a gun off me, and it didn't have my fingerprints on it. So I don't have any questions."
Dr. George McCormack, the coroner for Caddo Parish, was accepted as an expert in forensic pathology without objection. Dr. McCormack testified that his autopsy of the victim revealed that she died of a single gunshot wound to the chest. The pellets of the shotgun tore through the left side of the victim's breast plate, the heart, the left lung, and some ribs on the left side of her chest. Dr. McCormack concluded that the victim died of internal and probably external hemorrhage from the gunshot wound. The State introduced two photographs of the chest of the victim taken at the autopsy showing the shotgun entrance wound in the center of her chest.
Because the victim's wound had smooth edges and a round shape, it was Dr. McCormack's opinion that the gun was fired close to the victim's chest. However, Dr. McCormack also explained that nothing about the wound indicated that it was a "contact wound" such that the gun was held directly against the skin. Instead, the location of the wound and the path of the wound inside the victim's body were *820 consistent with the conclusion that the victim was crouching on the ground, turned sideways, when the perpetrator fired the shotgun at the victim from approximately two to five feet away. Dr. McCormack testified that the victim likely survived for a minute or two after the gunshot. The defendant did not cross-examine Dr. McCormack.
Lakischa Holloway and Virginia Burkette, two of the twelve witnesses called by the prosecution, provided the jury with comprehensive details of the events leading up to, and immediately following the shooting. Burkette testified that, at the time of the shooting, she had been romantically involved with Washington for a couple of months, and that through Washington, she met the defendant.
On the afternoon of February 11, 2002, Washington telephoned Burkette at her mother's house in Domino, Texas. Washington asked Burkette to give him a ride to the Magnolia Club that evening. Burkette agreed and drove from Domino to Atlanta, Texas, where she met Washington and the defendant at Holloway's apartment. However, by the time Burkette reached Atlanta, medication she took earlier that evening had begun to make her sleepy, and, as a result, she was unwilling to continue driving her car. Washington suggested that Burkette could stay at Holloway's apartment while he used her car, but Burkette was unwilling to relinquish her car to Washington. At that point, Washington and the defendant suggested that Holloway drive the vehicle, with Burkette, Washington, and the defendant riding along as passengers. Burkette agreed and got into the passenger side front seat and immediately fell asleep.
Burkette testified that when she first awoke, the group had arrived at the home of a woman she did not know, later identified as Diane Cooper. According to Burkette, Cooper had "problems" with Holloway and the two women did not get along. Burkette, Holloway, the defendant and Washington left Cooper's residence and went to another house in Rodessa. Cooper followed the four to the house and attempted to start a fight with Holloway by beating on Burkette's car. The fight was subsequently broken up. Burkette explained that at some point during this time period, the defendant retrieved a long shotgun, which he placed in her car. The four then drove to the Magnolia Club where Holloway parked the car in the front entrance parking lot. Burkette watched the defendant, carrying the gun, and Washington get out of the car and enter the Magnolia Club. Shortly thereafter, the pair ran out of the Magnolia Club and jumped into Burkette's car. Burkette recalled that, when the defendant entered the car, he announced: "I just blew that white bitch's head off." With Holloway still at the wheel, the four quickly exited the parking lot and traveled on the back roads of Rodessa. At some point, Holloway stopped the car and Washington and the defendant got out of the car, taking the gun with them. After stopping for gas in Linden, Texas, Holloway and Burkette drove back to Holloway's apartment, and Burkette returned to her mother's house in Domino, Texas. The following day, Burkette drove to a police station in Louisiana and asked to talk to the police about the events of the night before.
Burkette admitted that on the night in question, she was taking medication for depression, but denied that it affected her memory. Upon prompting by the district attorney, she reiterated her certainty that it was the defendant whom she saw enter and exit the Magnolia Club with a gun that evening.
On cross-examination, the defendant attempted to point out inconsistencies in *821 Burkette's prior statements given to police, and her trial testimony. Burkette denied remembering the inconsistencies in her statements, and, at that point, the defendant presented her with a copy of a statement she made to police in which she stated that the "one with a gun said he had just shot a woman in the throat." In another prior statement, Burkette told the police that the defendant and Washington had said, upon re-entering the car, that they were not able to get her any "E & J," a brand of liquor. The defendant attempted to undermine Burkette's credibility by questioning her about her "mental history," vision, and psychological state on the night in question. Burkette explained that she was taking medication because her doctor diagnosed her as a "massive depressant."[4] She also explained that she is blind in one eye and admitted to being drowsy, sleepy, dizzy, and on new medication that evening. Nevertheless, Burkette testified that these issues did not impair her ability to recognize the defendant as the man with her in her car that evening, and the man who entered and exited the Magnolia Club with a gun.
The defendant also tried to elicit testimony from Burkette that she was unable to identify him in a photographic lineup shown to her by police prior to trial, and that she had actually picked out someone else. However, Burkette, when questioned about this, only replied "not that I know of." The defendant elicited from Burkette that she only learned his name from the news because she knew him as "Cuz." Burkette agreed that the defendant was wearing a camouflage jacket that night. She also admitted that she was on medication at the time of trial and that she no longer drove.
Lakischa Holloway testified that on February 11, 2002, she was at her apartment in Atlanta, Texas, along with her cousin Carla, the defendant, Washington, and a woman named Pam. That afternoon, Holloway received a call from Burkette instructing her to ask the defendant and Washington if they were ready to be picked up by Burkette. In response, the defendant and Washington instructed Holloway to tell Burkette that they would be ready to be picked up at 8:00 p.m. A few minutes before 8:00 p.m., Burkette arrived at Holloway's apartment. Holloway then asked the defendant and Washington where they were going, and they informed her that they were going to the beer store and asked if she would like to come along. At first, Holloway declined, but the pair told her that if she accompanied them, they could take her to the home of a man who owed Holloway money. At that point, Holloway agreed to ride along with Burkette, the defendant, and Washington.
Holloway explained that the defendant and Washington did not want Burkette to drive, so Holloway took the wheel. The group first went to the home of Diane Cooper. Holloway and Cooper had a history of fighting with one another. Washington and the defendant entered Cooper's home for only a short period of time before they exited, and Holloway, Burkette, Washington, and the defendant moved on. Holloway recalled that the four then went to a house in Rodessa and Cooper followed them there, intent on fighting with Holloway. Holloway denied knowing why the group went to the house in Rodessa. Upon leaving the house in Rodessa, Washington and the defendant indicated that they wanted to stop at the liquor store.
Holloway drove the group to the Magnolia Club. She recalled that Washington was wearing a black sweater and the defendant was wearing a long camouflage *822 coat. Holloway and Burkette waited in the car while the defendant and Washington entered the Magnolia Club. Holloway denied seeing either man with a gun when they entered the store. The pair were not in the store for long before they exited and entered the car, instructing Holloway to drive off. Holloway testified the men instructed her to get on the back roads. After driving on back roads for a while, Holloway dropped off the defendant and Washington at the end of a road in Linden or Kildare, Texas, near the home of her brother's girlfriend. Holloway then drove back to Atlanta with Burkette, stopping briefly for gas.
On cross-examination, Holloway admitted that she never saw the defendant with a gun nor did she see him shoot anyone. Holloway also testified that she was 100% sure that the defendant was wearing the camouflage jacket that night. At that point, the defendant replayed the Magnolia Club's video surveillance tape from February 11, 2002. Holloway admitted that the perpetrator on the videotape was not wearing a camouflage jacket.
On re-direct, Holloway agreed that the jacket she recalled the defendant wearing was one that could be taken off easily. The state and the defendant then went back and forth questioning Holloway about the jacket. However, on further re-cross examination, the defendant initiated a line of questioning which resulted in Holloway testifying that, although she was not 100% certain, she heard the defendant say something like "I think I gun a white person in the neck." The defendant then confronted Holloway with an earlier statement she made to police in which she stated that she was not certain what she had heard the defendant say that evening. Holloway agreed with the defendant that she made the earlier statement to police about not being sure, however, she testified that the statement the defendant actually made "sounded something like that."
After presenting this evidence, the state rested. The defendant also rested, without calling any witnesses. Following closing arguments, the trial court instructed the jury. After deliberating for two hours, the jury returned a unanimous verdict of guilty of first degree murder.
The following day, the defendant announced that he wanted appointed counsel to represent him for the remainder of the trial. At the sentencing hearing, the state called four witnesses, the victim's husband, daughter, mother and employer. The defense called eleven witnesses, including the defendant's mother, brother, three aunts, and school employees who knew the defendant. The defense presented evidence of the defendant's age,[5] the circumstances of the defendant's parents' divorce, and the circumstances of the defendant's father's death. The defendant did not testify. Following the penalty phase, the jury, finding the sole aggravating circumstance urged by the state, that the murder took place during an armed robbery, returned a recommendation of death.
After denying post-verdict motions, the trial court formally sentenced the defendant to death on February 25, 2005. The defendant now appeals his conviction and sentence, raising 48 assignments of error.

LAW AND DISCUSSION
Mental Health and Competency Issues
Assignments of Error 1-25 and 47
The defense makes interrelated arguments for the court to consider which raise *823 issues of the defendant's mental health and competency.

Mental Retardation Claim
The defense contends that reasonable grounds exist to suggest that the defendant is mentally retarded; thus, his sentence of death violates the Eighth Amendment to the United States Constitution.
In Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), the Supreme Court held that the execution of mentally retarded persons constitutes an excessive punishment, and, thus, violates the Eighth Amendment. However, the Supreme Court provided no implementation guidelines, but rather, left to the individual States "the task of developing appropriate ways to enforce the constitutional restriction upon [its] execution of sentences." Atkins, 536 U.S. at 317, 122 S.Ct. at 2250. In Atkins, the Supreme Court suggested factors to consider for the determination of mental retardation:
clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.
Atkins, 536 U.S. at 318, 122 S.Ct. at 2250-2251.
In response to Atkins, the Louisiana Legislature enacted La.C.Cr.P. art. 905.5.1, which prohibits the execution of the mentally retarded, defines mental retardation for the purpose of exemption from capital punishment, and provides procedures for raising and trying the issue in a capital case.[6] The article defines "mental retardation" as:

*824 a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
La.C.Cr.P. art. 905.5.1(H)(1). The article concludes with an advisory list of several medical and/or mental health conditions which do not necessarily constitute mental retardation, and thus, would not fall within the constitutional exemption from capital punishment. La.C.Cr.P. art. 905.5.1(H)(2). Included on the list are mental illness, learning disabilities, speech and language disorders, and personality disorders. Id. Under the article, a defendant raising the issue of his exemption from capital punishment has the burden of proving mental retardation by a preponderance of the evidence. La.C.Cr.P. art. 905.5.1(C)(1).
This court has previously held that "the determination of whether a defendant sentenced to death has shown reasonable grounds to put at issue the fact of mental retardation ordinarily rests in the first instance with the trial court." State v. Dunn, XXXX-XXXX p. 1 (La.5/9/03), 847 So.2d 1183; State v. Williams, XXXX-XXXX *825 p. 27 (La.11/1/02), 831 So.2d 835, 857. In the present case, the defense contends that the record provides reasonable grounds to suspect that the defendant is mentally retarded and exempt from execution. Based upon the limited medical and psychological information in the record, due partly to the defendant's refusal to cooperate with evaluators, the defense requests that the issue be remanded to the trial court for an evidentiary hearing for a determination of whether the defendant is mentally retarded. Thus, this court must determine whether the record on appeal contains reasonable grounds to question whether the defendant is mentally retarded and exempt from capital punishment. See State v. Scott, XXXX-XXXX p. 84 (La.1/19/06), 921 So.2d 904, 959, cert. denied, ___ U.S. ___, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006).
The record reveals that no evidence of the defendant's possible mental retardation was presented at trial. Instead, during the penalty phase, newly-restored defense counsel[7] tried to convince the jury that the defendant "fumbled" his own defense in the same way that the defendant "fumbled" what was only supposed to have been a robbery of the Magnolia Club.[8] Defense counsel presented testimony from eleven witnesses in the penalty phase to persuade the jury to return a sentence of life imprisonment based on the arguments that the crime was not the worst sort of crime for which the death penalty should be reserved, and that the defendant himself was deserving of sympathy.
As to the evidence presented pertaining to the defendant himself, the defense called the assistant principal of the middle school attended by the defendant, Verne Henderson, to testify that the defendant was in special education classes in the seventh grade. A teacher's aide from the same school, Glenda Abraham, confirmed that the defendant was a special education student, so placed due to his classification as emotionally and behaviorally disturbed. Otherwise, the defense called as witnesses the defendant's mother, aunts and brother, who all testified generally that the defendant had been a "good kid" and respectful. None of these witnesses testified that the defendant was mentally retarded.
Our review of the record shows that there is no definitive evidence of the defendant's possible mental retardation, mainly due to the defendant's refusal to participate in any evaluation. The record reveals the defense obtained a continuance of the trial setting, from June 21, 2004 until September 13, 2004, to investigate the defendant's possible mental retardation based on the preliminary findings of Dr. Vigen, a defense expert. Dr. Vigen reported a preliminary finding showing the defendant had a full-scale I.Q. score of 67, which would place the defendant in the category of mild mental retardation. The defendant, however, was not in accord with his counsel's desire for further testing. At the hearing on the motion for continuance, held June 15, 2004, the defendant stated unequivocally that he did not want to talk to the defense's expert witnesses: "I haven't talked to no [sic] experts, I refused to talk to all of them cause I didn't want to *826 talk to them."[9]
The record reflects that the defendant's recalcitrance was not a new development. Dr. Vigen indicated in correspondence to defense counsel, dated June 11, 2004, that the defendant refused to be interviewed or refused testing nearly every time he was asked to participate, between August 23, 2002 (six months after the murder) through June 1, 2004 (less than three weeks before his trial date).[10] Another expert, Dr. Ware, in correspondence dated June 14, 2004, reported that the defendant refused to speak to him when Dr. Ware attempted to interview him.[11]
Both the state and the defense agree that there is no conclusive evidence of the defendant's possible mental retardation. However, the evidence relied upon by the defense on appeal in support of its claim can be found in the record as discovery responses provided by the defense in compliance with La.C.Cr.P. art. 905.5.1(D).[12] According to the defense, Dr. Vigen's preliminary testing showed that the defendant has a full-scale I.Q. of 67 and is possibly mentally retarded. In addition, an adaptive behavior test given to the defendant's aunt, who raised him, and the defendant's brother indicate that the defendant functions at a level well below his chronological age. School records indicate that the defendant repeated the second grade and was placed in special education classes in the fourth grade. The defendant remained in special education until he dropped out of school after three attempts to pass the ninth grade. Finally, the defense relies on a brief hearsay comment by the prosecutor during trial for the proposition that a possible state expert did not believe the defendant was malingering.[13]
The state counters the defense's presentation on appeal with its own arguments, based on the same evidence in the record. The state argues that, while the evidence may show evidence of emotional or behavioral problems, or even learning disabilities, the evidence does not raise the possibility that the defendant is mentally retarded. The state notes that defense counsel requested, and received, a continuance in order to further investigate this issue, based on Dr. Vigen's preliminary findings. Yet even after further investigation, *827 no evidence of the defendant's possible mental retardation was obtained.
In a second report compiled by Dr. Vigen, dated August 24, 2004,[14] Dr. Vigen noted that the defendant refused to see Dr. Ware and refused to see him and/or his staff on several occasions since the preliminary findings. Reviewing the defendant's school records, Dr. Vigen noted that the defendant had not done well in school, and often performed on tests well below grade level, but found that no previous diagnosis of mental retardation was ever made. With regard to the preliminary full-scale I.Q. of 67, Dr. Vigen related he was "not confident that these data truly represent Mr. Campbell's intellectual ability due to his easy distractibility [sic] and pattern of giving up so easily in the face of difficult tasks."
Dr. Vigen commented on a previous interview conducted by Dr. Williams, who found that the defendant was guarded and suspicious, with a constricted affect and poor eye contact. Dr. Vigen reported that Dr. Williams found the defendant's memory to be intact, his judgments to hypothetical situations to be fair, and his general fund of knowledge to be limited. Dr. Vigen noted that Dr. Williams found the defendant both competent to stand trial and possessing the ability to comprehend right from wrong at the time of the crime.
Dr. Vigen concluded his findings by admitting he had "questions about the validity of my data in that Mr. Campbell was easily distracted and less than fully cooperative in the assessment process." Dr. Vigen found the defendant uncooperative, but theorized the uncooperativeness could be seen as an adaptive mechanism intended to hide the defendant's deficiencies. Further, Dr. Vigen noted the defendant "has stated that the tests are a method for the prosecutor to gather information about him. Finally, it is my opinion that Mr. Campbell is a scared and angry man . . . He is an emotionally troubled person, which can manifest itself in resistance to others."
In its analysis of this evidence, the state maintains that the defendant was entirely correct in the statement he reportedly made to Dr. Vigen. Any reports generated by mental health experts would be provided to the state in discovery under the law. The state contends that Dr. Vigen's report of the defendant's resistance, anger and fear are hardly diagnostic, nor are they confined to the mentally retarded, and are not unanticipated reactions to being charged with first degree murder.
Turning to the defendant's school records, the state argues that despite numerous evaluations, the defendant was never diagnosed as mentally retarded.[15] Instead, the numerous assessments of the defendant reflect that emotional and/or behavioral difficulties affected his educational performance. Although the defendant could complete assignments when he wanted, he was often a disruptive influence in the classroom.[16] An evaluation in the 4th *828 grade found the defendant's inability to learn at the same rate as his peers stemmed "from emotional/behavioral influences rather than intellectual or learning disability causes."[17] A seventh grade evaluation noted that "[a] review of school records, available assessment data, and the previous evaluation indicated that LaDerrick's cognitive functioning appears to be adequate for educational purposes."[18] This assessment continues: "In summary, LaDerrick's educational performance continues to be significantly and adversely affected by his emotional/behavioral responses."[19] An observation of the defendant in an instructional setting showed "[h]e's capable of doing the academic work."[20]
The state maintains that the penalty phase witnesses' testimony of the defendant's performance in school is consistent with the assessments made. Verne Henderson, the assistant principal for discipline from the defendant's middle school, testified that, despite the defendant's discipline problems, he was "a good student overall."[21] He described the defendant with the phrase: "he could be an angel or a devil,"[22] although he related that the defendant would behave properly for a person for whom he had respect. According to Henderson, there was not, for the most part, a question of ability for the defendant as far as his school work, but only his discipline problems.[23] Teacher's aide Glenda Abraham also knew the defendant when he attended the middle school, specifically seventh grade.[24] She stated that the defendant was classified as a "special ed" student based on emotional and behavioral disturbance problems.[25] She testified he was often disrespectful, easily distracted and moody.[26]
The state urges that the defendant's special education classification was due to his emotional and behavioral problems, not to a lack of mental acuity. While the school records filed in pretrial discovery certainly indicate behavioral difficulties, emotional problems, and a defiance of authority, the state argues that there is no indication that the defendant's learning problems were related to mental retardation.
With regard to the testimony from the defendant's family members, the state points out that no one mentioned the defendant's possible mental retardation. In fact, the state contends that, when the defendant
took over his own defense, certainly not the wisest choice, he nonetheless displayed his ability to question and challenge jurors, to pay attention to the evidence being presented against him, to object at appropriate times, to cross-examine and even to impeach witnesses in pursuit of his chosen defense of lack of evidence, to read lengthy extracts from law books he had been studying and to present his own opening statement and closing argument.[27]
*829 Finally, the state contends that, despite the possibility of low I.Q. scores, the defendant's actions at trial and the testimony of his family and friends do not support a finding of mental retardation, as there was no indication that the defendant was lacking in the adaptive functioning skills needed to live alone, to hold down a job, to socialize or to otherwise operate independently in society. The state urges that, in order to reach a diagnosis of mental retardation, it is necessary to find a lack of these adaptive functioning skills in addition to an I.Q. of below 70.
After reviewing the small amount of psychiatric testing in the record, which was not presented at trial, the large volume of school records, the testimony of the witnesses and the defendant's conduct and demeanor both prior to and during trial, we find that on the present record the defense fails to show a reasonable likelihood that the defendant qualifies as mentally retarded. See State v. Manning, XXXX-XXXX p. 74 (La. 10/19/04), 885 So.2d 1044, 1107, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005)(evidence in the record insufficient to warrant remand for consideration of Atkins claim). Although the record contains much evidence to consider, unlike Manning, supra, where evidence was presented to this court in an appendix not submitted to the trial court, we conclude that the information contained in the documents upon which the defense relies does not support a reasonable likelihood of the defendant's possible mental retardation.
Preliminary test results showed the defendant may have a low I.Q., but even the expert who conducted the testing could not place reliance on the results. A low I.Q. score, alone, does not equate to a finding of mental retardation.[28] Moreover, the defendant refused to participate in further testing designed to determine whether he is mentally retarded. Although defense counsel contends the defendant's refusal to submit to testing is somehow evidence of his mental retardation,[29] the accuracy of that proposition is not possible to determine in the absence of some sort of context. We cannot base a finding of mental retardation, or the possibility of such, on the lack of evidence. Despite numerous assessments while the defendant was in school, he was never diagnosed as mentally retarded. Friends and family members did not provide testimony on this issue and defense counsel did not introduce at trial the evidence which the record does contain, available since pretrial discovery.[30]
*830 In addition, we find that the following evidence regarding the defendant's adaptive skills may be gleaned from the record and negates a reasonable likelihood that the defendant qualifies as mentally retarded. Dr. Williams's report indicated the defendant's self-report of work at a sawmill, on diesel trucks and at a paper mill.[31] He indicated to Dr. Williams that he had had girlfriends in the past. He stated that, while in prison, he was working on his G.E.D. In court, the defendant represented that he had spent his time in jail reading law books.
Although the evidence the defense relies upon here might provide support for a finding that the defendant may suffer from behavioral disorders, emotional disturbances, learning disabilities, or some type of mental illness, we find that none of these conditions necessarily constitute mental retardation. See La.C.Cr.P. art. 905.5.1(H)(2). Accordingly, we find a remand to the trial court for consideration of this issue is unwarranted at this time and on this record.

Eligibility for Death Penalty Considering "Mental Age"
In a related argument, the defense contends that his mental age places him in the category of persons for whom a death penalty is unconstitutional under Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). In Roper, the Supreme Court held that the Eighth Amendment prohibits capital punishment for offenders who are under the age of 18 when they commit their crimes. The defense argues that, since the defendant consistently performed on tests well below his grade level and chronological age, and since the defendant was only 18 years of age at the time he committed the instant offense, the death penalty prohibition in Roper should be extended to the defendant.[32]
However, Roper established a bright-line demarcation for application of the standard announced therein, rather than a standard which could be applied to a defendant's "mental age" on a case-by-case basis:
Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguished juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. . . . The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest.
Roper, 543 U.S. at 574, 125 S.Ct. at 1197-1198. Because the defendant was 18 years old when he committed the first degree murder of Kathy Parker during the commission of an armed robbery, despite his alleged "mental age," we hold that he is not eligible to benefit from the death penalty exemption set forth in Roper.

Competency
In these assignments of error, the defense contends that the trial court erred in *831 failing to grant defense counsel's motion for a sanity commission during voir dire, or in unilaterally ordering such an examination, after the defendant exhibited behavior that provided the trial court with reasonable grounds to doubt the defendant's mental capacity to proceed. In addition, the defense argues the trial court erred in subsequently allowing the defendant to waive counsel and proceed with self-representation for the guilt portion of his capital prosecution.
Although the defense's assignments of error concern alleged errors which occurred during voir dire and trial, the following background facts are important for a full understanding of the issues presented.

Pre-trial Matters
After the defendant's arrest, counsel was appointed to represent him. During pretrial proceedings, defense counsel retained expert witnesses who performed psychological evaluations of the defendant. The defendant passed two court competency tests.[33] Dr. Williams, after an evaluation conducted on August 19, 2002, found the defendant competent to stand trial:
Mr. Laderrick Cambell [sic] currently has the ability to consult with his attorney with a reasonable degree of understanding and currently has a rational and factual understanding of the proceedings against him. Specifically, he understands the nature of the charge against him and appreciates its seriousness. He understands the defenses available to him. He can distinguish a guilty plea from a not guilty plea and understands the consequences of each. He has an awareness of his legal rights. He understands the range of possible verdicts and the consequences of conviction. He has the ability to recall and relate facts pertaining to his actions and whereabouts at certain times. He has the ability to assist counsel in locating and examining relevant witnesses. He has the ability to maintain a consistent defense. He has the ability to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements. He has the ability to make simple decisions in response to well-explained alternatives. If necessary to his defense strategy, he is capable of testifying in his own defense. His mental condition is not likely to deteriorate significantly under the stress of trial.[34]
The record also reflects that, prior to trial, the defendant filed several pro se motions, including two motions seeking the appointment of new counsel. The defendant stated that the basis of the motions to appoint new counsel was that appointed counsel did not believe in the defendant's innocence. The defendant questioned how he could be represented properly under that circumstance.[35]
At a hearing held November 19, 2003, however, the defendant indicated to the court that he was "okay" with counsel now and that the court need not go further on the motions for new counsel.[36] At that time, the defendant argued his pro se motions *832 to the court,[37] two of which were taken under advisement so that the trial court could read the defendant's written notes, and two of which were granted as discovery requests, with the state ordered to provide the discovery requested to defendant's counsel.[38]
On March 18, 2004, the defendant filed a pro se motion for speedy trial, seeking that his trial date be set without further delay.[39] A hearing was held on this motion, as well, on April 12, 2004, with appointed defense counsel refusing to adopt the defendant's motion due to the "strength of the evidence against Mr. Campbell" and counsel's fear that a speedy trial would lead to a speedy conviction and death sentence.[40] Defense counsel admitted that there were no major outstanding motions, but that he was against the motion because he thought it was "a bad idea."[41] The defendant, however, told the court that he was ready to go to trial.[42] Based on the defendant's pro se filing and over the advice of defense counsel, the trial court granted the motion for speedy trial and set a trial date for the week of June 21, 2004.[43]
On June 9, 2004, the trial court took up some outstanding defense motions regarding the conducting of voir dire and trial, and some supplemental discovery.[44] On June 15, 2004, however, six days before the scheduled trial date of June 21, 2004, defense counsel filed a motion for continuance of the trial based on the preliminary findings of defense expert Dr. Vigen. The trial court granted defense counsel's motion over the state's objection.[45]
When the trial court addressed the defendant about the continuance, the defendant indicated that he did not understand why his case was being continued. When the trial court stated the continuance was based on the fact that the defense experts were not ready to go forward, the defendant bluntly told the court that he had not spoken to any experts and refused to speak to defense counsel's experts.[46] The defendant complained that defense counsel would not listen to what the defendant told him, but counsel just told the defendant what he wanted the defendant to hear. After the trial court advised the defendant to work with his lawyer, the defendant indicated he understood what the court had done.[47] Trial was re-set for September 13, 2004.[48]

Voir Dire

First Day of Voir Dire
Apparently, timing was not the only conflict between the defendant and his appointed counsel. On the first day of trial, September 13, 2004, defense counsel placed on the record that the state had indicated that a guilty plea in return for a life sentence was acceptable to the victim's family and the state. Defense counsel stated that he had spoken to the defendant about this offer at length, but that the defendant did not wish to plead guilty in *833 exchange for a life sentence, against counsel's advice.[49]
At this time, the defendant, who had been indicating by his raised hand that he wished to speak to the court,[50] informed the trial court that he had "pressed charges on his attorney." According to the defendant, one of his counsel slammed the door on his arm, which incident was visible on a videotape. In addition, two deputies apparently witnessed the occurrence and had indicated to the defendant that they would fax over a report on the incident if the trial judge so requested.[51] When the trial court asked defense counsel if he knew what the defendant was talking about, defense counsel indicated that he did, but that he would prefer to speak about it in chambers with only the defendant, the trial judge and defense counsel present since it approached privileged attorney/client information.[52] In trying to determine what specifically the defendant was requesting, the trial court obtained from the defendant that he did not want a delay in the trial and did not want new counsel.[53] Other than noting the defendant's observations for the record, which appeared to be all the defendant wanted, the trial court took no further action regarding the observations.
After the state and the defense announced ready for trial, jury selection began. Immediately prior to jury selection, the trial court obtained the defendant's specific denial on the record of the state's proposal that he plead guilty in exchange for a sentence of life imprisonment.[54] Voir dire questioning commenced for the rest of that day.

Second Day of Voir Dire
The next day, September 14, 2004, voir dire continued. At the end of the day, and outside the presence of the prospective jurors, the defendant indicated to the court that he wished to speak to the trial judge. At that time, the defendant stated that he had seen defense counsel and the prosecutor talk to the jurors and make hand signals. The defendant indicated that the attorneys had been doing this all day, but that he had not interrupted, preferring to place his observations on the record at the end of the day. The trial court stated that he would give the defendant until first thing in the morning to indicate how the defendant wished the court to address these observations, and that the trial court would ask for responses from counsel at that time.[55]

Third Day of Voir Dire
The next morning, on September 15, 2004, the third day of jury selection, the defendant reiterated that he had seen the attorneys pointing and trying to "coerce" the prospective jurors. The trial court elicited from the defendant that when he said "coerce," he was referring to the attorneys speaking to the prospective jurors. When asked what the defendant thought the attorneys were doing that was improper, the defendant responded that he thought they were trying "to persuade *834 them I'm guilty."[56]
When asked to respond to these observations, defense counsel stated, "I don't know what to say, Your Honor, it sounds like nonsense to me."[57] The prosecutor stated positively that the defendant's observations were nonsense. "There's been no hand signals, no gestures for the record. . . . There's been no undue influence, there's been no hand gesturing, this is nonsense."[58] When asked what he would like the trial court to do based upon his observations, the defendant suggested that someone "be like an assistant or something, like to watch them."[59]
Instead, the trial judge delivered a lecture to the defendant encompassing six and a half pages of the record. In this lecture, the trial judge acknowledged that the defendant was having difficulties getting along with his counsel, first one and then the other, even to the extent of telling the court that he filed a complaint against one of them. The trial judge indicated that he was troubled because he did not think the defendant was focusing on the seriousness and importance of the trial, which was for a very serious crime and for which the state was seeking, as the trial judge bluntly stated, to kill him. The trial judge stated: "All the laughter, all the gestures, all the observations bothers me."[60] In asking the defendant to work with his lawyers, the trial judge stated he would pay close attention.
The trial judge instructed the defendant that, if at any time the defendant believed anyone in the courtroom was acting improperly, including the trial judge, then all the defendant needed to do was obtain the court's attention and, at an appropriate time, the trial judge would address the defendant's concerns. The trial judge then gave the defendant and his counsel fifteen minutes time to "bridge the gap and make certain that they are comfortable and you are comfortable and we're going to proceed."[61] The trial judge concluded his lecture by stating his desire that the defendant not think he was being treated unfairly. When asked by the trial court if the court's directions were "fair enough," the defendant responded, "Yes, sir."[62]
After speaking with the defendant for about half an hour, defense counsel placed on the record that the two defense counsel had, again, urged the defendant to reconsider his position of proceeding to trial. Counsel indicated that, against the advice of both defense counsel, the defendant wished to continue to trial.[63]
Jury questioning continued that day. At the end of the morning's questioning, after the prospective jurors had been dismissed for the lunch recess, the defendant asked the trial court if he could be moved to another courtroom "because I feel like this whole case has been coerced."[64] Questioning by the trial court elicited from the defendant that he believed everyone in the courtroom was working together against him. The trial court explained that everyone in the courtroom did work together, then asked the defendant to be specific about his complaints with regard *835 to how the defendant thought that he, the trial judge, was working against him. The defendant answered only that the trial judge had made eye contact with everyone in the jury box and in the audience. The trial court responded that the defendant was correct, that the trial judge had maintained eye contact with the bailiffs, prosecutors, and even the defendant himself. When asked why that would imply that the trial judge was working against the defendant, the defendant had no response.[65] At that point, the trial judge indicated he would not allow the defendant to consume all of the court's time for him to place similar observations on the record for all of the court personnel, but just made the blanket expression for purposes of the record that the defendant stated that everyone was working against him. The trial judge indicated the defendant was "still missing it," indicating the defendant was missing what was important in the unfolding trial.[66] The defendant next asked if he could delay his speedy trial so that he could get prepared. The trial court denied that request, noting the defendant's objection, but reiterating that any time the defendant needed to say something, the trial court was going to give the defendant that opportunity.[67] The trial judge again gave the defendant a brief lecture, although this time, the trial judge emphasized that they were in the middle of the jury trial, that the jury which was selected was going to hear evidence, and the jurors would be the ones making the determination as to the defendant's guilt, and not the bailiffs, not the deputy, not the lawyers or the judge. The trial judge reiterated that he was not working with anyone in the courtroom against the defendant and urged the defendant to work with his attorneys.[68]
The defendant next asked if he could obtain the transcripts of the voir dire and asked which day the actual guilt phase of the trial would start. The trial court told the defendant that the transcripts of voir dire had not yet been prepared, that the transcripts would not be prepared on a daily basis, that the defendant would receive a transcript if he were found guilty, and that if he were not found guilty the defendant would have to pay to receive the transcripts. The trial court told the defendant he anticipated that the jury would be picked that week. The defendant then indicated he had no further questions.[69]
After the defendant finished with his observations and questions, defense counsel indicated he had several observations to make. First, defense counsel stated that the defendant had accused a person identified as Ms. Pope of signaling to the jury. Defense counsel informed the court that the defense had requested that Ms. Pope help the defense take notes. Defense counsel stated Ms. Pope was sitting where she had a clear sight line with the jury and was not working against the defendant. Second, the defendant had informed defense counsel that the prosecutor was making hand signals and communicating with the prospective jurors while questioning them. Defense counsel informed the court that the prosecutor was making hand gestures while he talked, like a lot of people do, and that there was nothing unusual going on. Third, the defendant had informed defense counsel that two prospective jurors were pointing and making signals to *836 the prospective jurors being questioned. Defense counsel informed the trial court that he saw no such signaling. Instead, these persons indicated were paying attention to questioning and waiting for their turn to be questioned. With regard to the defendant's request for the use of another courtroom, defense counsel informed the court that he had discussed with the defendant that the courtroom currently being used was the best one logistically for a first degree murder trial.[70]
Finally, out of an abundance of caution, defense counsel asked the trial court for the appointment of a sanity commission. Defense counsel maintained, "I understand if the Court denies that and regards that as foolishness. I understand if the State objects to it considering we're in the trial and says it's foolishness. We may well be dealing with foolishness, but frankly I don't know if Mr. Campbell is losing his mind or this is a lot of foolishness."[71] In making this request, defense counsel noted that the defendant passed court competency tests, which was why a sanity commission was not requested earlier. He also warned the defendant that his request might create more adverse evidence against him.[72]
In response, the state objected to the appointment of a sanity commission. The prosecutor pointed out that they were in the middle of trial and that the evidence from the defense's own expert ran counter to defense counsel's request, having found that the defendant was competent to stand trial. The state urged that there had been no adequate showing other than defense counsel's observations, which the prosecutor felt were accurate, but which did not speak to the defendant's sanity. From a simple policy standpoint, the state argued that a defendant who did not obtain a requested continuance, as had happened in this case when the defense sought continuance immediately prior to trial, could nevertheless make questionable observations during trial which would result in the appointment of a sanity commission, and the requested continuance would therefore be obtained.[73] Defense counsel indicated he had nothing further to state in response.[74]
The trial court denied the motion for a sanity commission or to have the defendant examined without further comment.[75] No further observations or comments were made by the defendant that day.

Fourth Day of Voir Dire
On September 16, 2004, after the attorneys had completed the voir dire of several jury panels, the trial court stopped counsels' questioning because the defendant signaled that he would like to speak to the judge. Outside of the prospective jurors' presence, the defendant told the trial court that he had been observing the attorneys, both prosecution and defense counsel, making hand gestures and pointing among themselves and with prospective jurors. The defendant maintained that two of the prospective jurors on the panel currently being questioned may have seen the actions *837 to which he referred. Defense counsel indicated they had no idea what the defendant was referring to, other than to observe that they had passed things to each other in the normal course of consulting about jury selection matters. The prosecutor stated he had seen nothing, and posited his opinion that the inquiry was "very frivolous." The trial court noted the defendant's observations for the record, encouraged the defendant to stop the trial and make comments whenever he felt something was being done improperly, and that the court would follow up at an appropriate time on the defendant's observation that prospective jurors had seen the actions.[76]
A little while later, the defendant again indicated to the trial court that he had something to say. Outside of the prospective jurors' presence, the defendant told the court that he had seen one of his attorneys talking to two women who were prospective jurors. When the defendant was asked if he heard what defense counsel was allegedly saying, the defendant then stated counsel was not talking out loud, but was pointing at him. Defense counsel denied that he was doing anything other than taking notes and listening to the prosecutor's voir dire questioning. One of the two prosecutors placed on the record the fact that he was physically sitting between defense counsel and the prospective jurors and indicated his inability to imagine defense counsel being able to communicate with a juror through him, especially since defense counsel was well within his field of vision and the prosecutor had not seen defense counsel gesture, speak or do anything but organize his paperwork. The trial court indicated he had not seen the actions to which the defendant referred and indicated his concern whether or not the defendant was observing something that was real or not real. When asked by the trial court if he had anything else for the record, the defendant indicated he did not.[77]
At the end of the prosecutor's questioning of that panel, the record shows that the defendant had raised his hand several times to indicate to the trial court various actions the defendant wished the court to note. In detailing the defendant's concerns, the trial court chronicled separate events observed by the defendant. First, defense counsel moved his left hand behind his ear and made a kind of hand gesture as he sat. The defendant indicated that this is when he believed defense counsel was pointing at him. Second, the defendant claimed defense counsel leaned back and gestured at him. Third, the defendant saw one of his defense counsel turn and look at two people. The defendant claimed counsel was blocking his view of the prospective jurors. Finally, the defendant saw the prosecutor who was engaged in voir dire questioning turn and whisper in the other prosecutor's ear. At this time, the defendant saw several prospective jurors look at that. The trial court noted that he had seen most of the movements that the defendant commented upon, including one time when the defendant obtained the court's attention as one of the prosecutors turned toward one of defense counsel.[78]
After successfully chronicling these movements to the defendant's satisfaction, the trial court asked the defendant what the defendant wanted the court to appreciate or understand by making these observations. The defendant replied that he did not believe he was having a fair trial. The *838 trial court responded that beyond making the record for the day, the court would allow the defendant to address the next morning any other concerns the defendant had.[79]
At that time, defense counsel placed on the record his recollection of having made the movements described by the defendant. According to defense counsel, he may not have even been conscious of making the gestures at the time that he made them.[80] The prosecutor stated for the record that he had whispered to his co-counsel in order to make sure he had not forgotten to ask a relevant question. His co-counsel admitted he did in fact turn when the defendant indicated, but only because he saw the defendant gesture to the court.[81] One of the prosecutors stated for the record that "these are all innocuous normal motions by people taking notes and listening and watching, and nothing in the nature of communication has been taking place."[82]
When asked if he needed to place a final comment on the record, the defendant told the trial court, "I'm going to leave it to you."[83] The trial court then told the defendant that he would give the defendant time to think until the morning so that the defendant could make some final request to the court as to the meaning of the defendant's observations.[84]
Defense counsel then questioned the panel of prospective jurors. At the completion of defense counsel's questioning, and outside the presence of the prospective jurors, the defendant told the court that he had seen one of the prosecutors talking to female members of the panel while defense counsel was questioning them. The defendant reiterated that he did not think he was receiving a fair trial. He then indicated to the trial court that, if he were found guilty, he wanted the trial court "to do the death penalty."[85] Before the trial court elicited the prosecutors' responses, the trial court wanted to make sure this was the defendant's only comment, as he had gained the court's attention on more than one occasion. Despite the fact that the defendant had raised his hand more than once, the defendant indicated "that was it."[86]
In response, the prosecutors denied speaking to panel members while defense counsel questioned them, and denied communicating with them through gestures, sign language or body language. Co-counsel confirmed that no communication was made with the jurors during defense counsel questioning.[87]
Although asked if he wanted to make a final comment on his observation, the defendant told the trial court, "leave it to you."[88] Considering the defendant's comment about the penalty phase as a request or motion for the court to consider penalty, the trial court denied such request, informing the defendant that the jury made the determination of penalty and guilt.[89] After hearing counsel's challenges as to this panel, the trial court called in for specific *839 questioning the two panel members to whom the defendant claimed the prosecutor was talking or communicating. Although one of the prospective jurors claimed that the prosecutor was staring at her which made her uncomfortable, both prospective jurors denied that any communication was made to them by the prosecutor during defense questioning.[90]
In giving instructions for the end of the day, the trial court indicated he would afford the defendant the opportunity the next day to place final comments on the record based upon his observations of the day.[91]

Fifth Day of Voir Dire
The next day, September 17, 2004, the trial court asked the defendant, in follow-up to the concerns expressed by the defendant on the day before, whether the defendant wanted to say anything else to the court based on his observations of the previous day. The defendant responded: "No, sir. I thought about it andI said I thought about it . . . and I'm all right."[92] The trial court noted that the record would reflect that the defendant had appropriately expressed his concerns and made his observations in terms of arguments to the court that the court received for purposes of the record.[93] Thereafter, voir dire questioning proceeded for the day.[94]
After the lunch recess, the defendant complained to the court that his counsel had a problem explaining intent to the jury. When the trial court asked if defense counsel had the opportunity to address the prospective jurors about that issue yet, which he had not, the defendant claimed defense counsel told him he was not going to do it. At this point, the trial court asked the defendant to hold that objection or comment in abeyance, because the objection was premature. Defense counsel had not yet questioned prospective jurors, and until he had, the defendant could then make a record that he objected to counsel's actions. Upon hearing the trial court's ruling, the defendant replied, "Yes, sir."[95]
When defense counsel finished voir dire questioning of the panel, and before the trial court proceeded with any individual voir dire, the trial court noted that the defendant had indicated on certain occasions during the questioning that the defendant wanted the court's attention. Upon being questioned as to his concern, the defendant, for the first time, indicated that he wanted to represent himself. "I wanted to know could I represent myself?"[96]
When the trial court tried to ascertain what the defendant meant, the defendant made clear that he meant he wanted to represent himself at trial, fighting his case and cross-examining witnesses.[97] Although he initially indicated he did not want to pick the jury, but would rather *840 help his counsel pick the jury,[98] his opinion changed after further questioning by the court.
In trying to determine why the defendant raised his hand to obtain the court's attention several times during his counsel's questioning of prospective jurors, the defendant indicated he was dissatisfied by the manner in which counsel questioned the panel about circumstantial evidence and intent. According to the defendant, counsel was not questioning panel members about these subjects the way that the topics were covered in books read by the defendant. In addition, the defendant accused his counsel of "coercing the whole case to the jury," which he further explained meant letting the panel know everything that happened in the case. In the trial court's attempts to understand precisely what the defendant was complaining about, the trial court told the defendant that coercing, persuading or manipulating the prospective jurors, or whatever term the defendant used, in order to obtain a jury most favorable to the defendant, was precisely what defense counsel was supposed to be doing. The trial court indicated that, if the defendant meant anything other than that by his statements to the court, the trial court did not understand and had not seen defense counsel do anything inappropriate. Although the trial court believed that he and the defendant experienced a miscommunication at this point, the record is clear that the defendant felt that defense counsel's actions were "bad."[99]
The defendant then asked the court if he would be allowed to speak to the jury. When the trial court tried to ascertain at what point the defendant wished to speak to the jury, the defendant indicated that he would like to take over the voir dire questioning so that he could explain to prospective jurors what the concepts of intent and burden of proof were. At this point, the trial court decided that he would have to confer with counsel because the defendant was expressing a desire to represent himself from that point forward.[100]
After taking a lunch recess, the trial court allowed counsel to undertake individual voir dire questioning of the previous panel, heard cause challenges as to that panel, and dismissed the prospective jurors still waiting for questioning.[101] The trial court then addressed the defendant with regard to his desire to represent himself. The trial court told the defendant that he had a constitutional right to be represented by counsel, that two attorneys had been appointed to represent him who were both experienced and certified to handle capital cases. The trial court indicated his personal knowledge of these attorneys' experience. The trial court noted that he was aware of the conflict existing between the defendant and these two attorneys, both prior to trial, at the start of trial, and through the defendant's observations of hand motions and other actions that the defendant believed were gestures designed to represent the defendant inappropriately. Even with that conflict, the trial court reiterated that the defendant's appointed counsel were experienced. The trial court stated that his only information regarding the defendant was what he had observed of the defendant in court and how the defendant had conducted himself. The trial court noted that the defendant had always followed the court's instructions and made comments and observations *841 in an appropriate manner. The trial court gave the defendant the advice that a defendant in any criminal trial would face serious dangers in representing himself, as the defendant would have no knowledge, experience, or expertise. The trial court noted that the defendant was facing the most serious type of criminal case, and baldly stated that the state was trying to kill him.
The trial court also informed the defendant that a defendant has the right to represent himself. Although the trial court could not influence the defendant's decision in this regard, the trial court had to make certain the defendant understood the consequences and ramifications of self-representation. The trial court stated that the defendant would be faced with rules of evidence, court procedures, techniques for cross-examination and direct examination, summoning witnesses, objections, case law, and statutes. The trial court told the defendant that, if he represented himself, the defendant would, in the trial court's estimation, be making "a very grave mistake." The trial court indicated that the defendant should have made the request to represent himself before the trial started, and not in its middle, and that the court's advice would be to continue with counsel and start working with counsel for his defense.[102]
After having stated the foregoing, the trial court ascertained through questioning that the defendant was 21 years of age.[103] The defendant stated that the highest grade he had completed in school was the 10th grade. He admitted he had no other formal education, but indicated he had been reading legal books for the 2 ½ years he had been incarcerated. As for the defendant's prior employment, the defendant stated he had worked in maintenance at the paper mill in Domino, Texas for approximately three months. Prior to that, the defendant had worked for about three months stacking lumber at a saw mill in Atlanta, Texas. For about a year prior to that, the defendant stated he had worked at a truck stop sanding down diesels.[104]
When asked by the trial court if he had ever lived by himself or supported himself, the defendant indicated that he had lived with a woman and he had supported her. He answered affirmatively when asked by the trial court whether he had had the wherewithal to manage a household and take care of himself.[105]
The defendant admitted that he had been in court before, and in front of the same judge. Although he had been in court before, he admitted he had never seen a jury trial. The defendant also admitted he had never read legal books prior to his incarceration. However, his reading during incarceration included reading about jury trials, the law of evidence, the law of criminal procedure, and court cases on first degree murder, armed robbery and the death penalty. He stated that he knew about objections, which he described as being made "whenever you disagree *842 with the District Attorney."[106] The defendant indicated he had never talked to appointed counsel about the conduct of a jury trial and that his only experience on the matter was what had been conducted in his trial that week. Nevertheless, the defendant indicated he watched television shows about jury trials such as "Law and Order" and "Cold Cases." The defendant stated he loved "to read, that's my favorite subject."[107]
The defendant affirmed that he understood he would have to rely on his own knowledge, education, skills and familiarity with the law with regard to how to handle himself in a jury trial; that the best the court could do would be to appoint stand-by counsel, which would be a limited role in his trial; that there were risks and negative consequences in self-representation; that he was at a disadvantage in not having the experience, formal education or knowledge of the law; and that the persons representing the State of Louisiana, which was seeking the death penalty, had such knowledge, skill and experience, as well as support staff and resources.[108] Knowing that the case had already started, the defendant affirmed that he understood that he would not have the benefit of research, investigation, preparation and all other resources which may or may not have been available to him prior to trial. He also stated, "Yes, sir, it won't take that long, though." The defendant indicated his understanding that his lack of preparation could place him at a grave disadvantage. The defendant also indicated his understanding that by representing himself, he might not be establishing a proper record for appeal.[109]
The defendant asked the court, "If I need any like  if I need just like a little assistance or some help with a word or something, that's what the standby counsel is for?"[110] The trial court answered that could be one of the responsibilities of standby counsel but further instructed the defendant that standby counsel would only give advice or assistance if the defendant sought that assistance. The defendant indicated his understanding of the role of standby counsel by stating, "I follow you. You're saying that if I need some help with something, I have to come to him, it ain't his job to get up and help me."[111]
After asking the defendant if he had any questions or information he wanted to provide to the court to persuade the court that he could handle self-representation, the defendant told the court that the only things he needed were some legal books, including the evidence code.[112] Otherwise, the defendant stated, "I believe I can handle it. I believe that if  I believe I can do it on my own. If my lawyers do it I won't be represented appropriately."[113] When asked what the court would tell him about representing himself, the defendant responded:
Defendant: "I would think that you would tell me that it's dangerous and "
Court: "And you shouldn't do it."
Defendant: " it's a risk."[114]
*843 Finally, the trial court addressed the defendant, as follows:
Court: . . . I've said everything that I possibly could to find out what's going on and make certain that you understand what you are doing. I think you've demonstrated that you will follow the Court's instructions. I think you can talk loud enough and communicate well enough, and I'm really not certain what's going on as to why you feel you should represent yourself, and I'm going to get to that as to what's really going on before I make the ultimate decision, but I am at a point where I think I've exhausted all of the Court's questions and I think I've said enough that you need to have enough information to make this decision.
Having said that, do you still want to go forward without the benefit of counsel and represent yourself based upon this discussion you and I have had today?[115]
The defendant responded, "Yes, sir. I would like to know would I be provided a book?"[116] The trial court indicated that the defendant would be provided with whatever books he needed for his defense. Thereafter, the trial court stated that, having ascertained that the defendant desired to represent himself, the trial court wanted to make a record as to the source of the conflict between the defendant and his appointed counsel. The trial court ordered that the court, the defendant, defense counsel, the bailiff and the court reporter would hold a hearing, closed to the state and the public, during which the participants could discuss any conflict which pertained to the defense of this matter.[117]

Closed Hearing[118]
In the closed hearing, the trial court explained to the defendant the purpose of the hearing. The trial court explained that, if there was a conflict between the defendant and his appointed counsel as to what the defense strategy should be, that conflict would be a factor that the trial court would consider in determining whether the trial court found the defendant competent to waive his right to counsel.[119] The defendant volunteered to inform the court what the problems were between him and his appointed counsel. The defendant referenced the incident immediately prior to jury selection when he informed the court about counsel slamming his arm in a door. The defendant also indicated his belief that he was being misrepresented and that he had filed a motion for new counsel based on what his counsel discussed with him.[120] When reminded by the trial court that it was the defendant's decision to proceed to trial instead of obtaining new counsel that would force a continuance, the defendant candidly stated, upon being asked if the trial court had misunderstood him, "No, sir, I thought that we was going to have a better understanding, he was going to start doing better or whatever, but it's got *844 worser [sic]."[121]
When the trial court asked the defendant to clarify in what way the situation had worsened, the defendant indicated that counsel was not representing him appropriately in that counsel was not presenting the defense that the defendant wanted. Instead, according to the defendant, counsel was ". . . trying to get me convicted of second degree murder. He going on that I'm guilty of second degree murder."[122] When pointedly asked by the trial court whether his appointed attorneys had one defense strategy, which the defendant disagreed with, and the defendant wanted to present another defense strategy, the defendant responded, "Yes, sir."[123]
Lead appointed counsel stated that, after considering the discovery and investigating the matter, counsel's defense strategy was to argue that the defendant was guilty of second degree murder, so as not to present a frivolous defense and in order to have credibility before the jury in the event there was a penalty phase where counsel would have to argue for mercy. In support of that strategy, counsel considered that the state's evidence was "so strong," including an eyewitness (Jackson), who had known the defendant since he was a child, and who could place the defendant in the store with the gun, and if not in the act of shooting, then leaving the store just after the shooting. In addition, counsel considered that the state had two witnesses who had been in the getaway car with the defendant, who would testify about the defendant admitting to the shooting or at least the consciousness that he had committed the shooting. Defense counsel also anticipated that the state would have other witnesses who would place the defendant in the hours and days after the offense saying either that he had been the shooter or thought he committed the crime. Defense counsel believed that there were issues regarding the condition of the murder weapon and the defendant's knowledge of the weapon that could arguably support a conviction for second degree murder, but basically maintained that they wanted to pursue a defense of admitting to second degree murder in order to save the defendant's life.[124]
The defendant disagreed with his counsel's appreciation of the evidence and told the trial court that he had stated his disagreement to his attorneys. However, according to the defendant, his counsel maintained their belief that the defendant was guilty of second degree murder, and that was the defense which they intended to present. The defendant clearly informed the trial court that he did not want his counsel to present that defense and, if he represented himself, he would not present that defense. When asked by the trial court whether he felt he had the wherewithal to represent himself against the court's advice and his counsel's advice, the defendant replied, "Yes, sir, better than they can."[125]
The trial court cautioned the defendant that the question was not necessarily which defense was better, but that his appointed counsel had a position which the defendant did not agree with and did not want presented versus the defendant's own skills to present the defense he did want presented. The trial court also questioned the defendant as to his understanding that, if he was convicted, or even if he received the death penalty, this was his decision to *845 present the defense of his choice. The defendant stated he understood but asked the trial court how his choice to self-represent would be indicated for the record. The trial court explained that he would pose a question to the defendant, based on all of their discussions, whether the defendant still wanted to represent himself. The trial court indicated that if the defendant wanted to do so, the trial court would probably grant his request.[126]
The trial court then, again, stated his opinion that the defendant should not make the decision to self-represent, but that he understood the defendant's right to do so. He asked the defendant if there was anything he could say that would change the defendant's mind. The defendant indicated his mind was made up. The trial court then asked counsel if there was anything they could say to the defendant to persuade him to change his mind. Both counsel indicated they could not persuade the defendant otherwise; one counsel indicating that the basis for his opinion was his almost two year representation of the defendant.[127]
The trial court reiterated that the prosecutors and defense counsel knew the case best, that the trial court did not know the case, but that if the defendant decided to represent himself, the trial court would allow that, noting that the defendant had been obedient to the court's instructions and very determined in his presentation of his position to the court.[128]
When asked by the defendant if the trial court would rule in his favor on objections if he could support them with law, the trial court indicated that he would, but reiterated that the defendant would ultimately have to convince the jurors and not the judge.[129]
In concluding the closed hearing, the trial court indicated he would bring in the prosecutors and inform them of his initial determination. However, the trial court stated he would "sleep on this," and hoped that the defendant would give further consideration to his request, too. The trial court indicated his initial determination was to grant the defendant's request to waive counsel:
But I'm telling you I'm persuaded right now that if you want to represent yourself, you understand the consequences, this is your life, you disagree with them, and I don't think you would be happy unless you are representing yourself. And when it's all said and done, regardless to what the jury decides I want you to be at peace with yourself, because I'm going to be at peace with myself.[130]
The defendant indicated his agreement with the trial court's statements and the hearing concluded with the defendant discussing which legal books he wanted in order to facilitate his defense.[131]
Back in open court, and in the presence of the state, the trial court stated that it was the court's intention to accommodate the defendant's request to represent himself with standby counsel, but that the matter would be taken under advisement until the next morning.[132]

Sixth Day of Voir Dire
The next day, on September 18, 2004, defense counsel presented a motion, requesting *846 that the trial court engage in an additional colloquy with the defendant. Defense counsel maintained that he did not question the thoroughness of the trial court's inquiry of the preceding day, but stated that he had done further research on the issue and had spoken to the defense expert, Dr. Vigen. Defense counsel suggested that the trial court ask the defendant to read some statutes aloud and to discuss what he thought they meant. The state, while not objecting to the motion, made the observations that the legal question here was not the defendant's comprehension or understanding of the law, but whether the defendant knowingly and willingly wished to exercise his right to represent himself knowing the dangers or pitfalls associated with self-representation, one of those pitfalls being a lack of knowledge of the law.[133]
Before making a ruling on defense counsel's motion, the trial court again addressed some questions to the defendant. In response to the trial court's questions, the defendant indicated he still wanted to represent himself. The defendant informed the court that he had been told he would be allowed to obtain additional books he wanted from the library that day; the trial court indicated the court had sent the defendant three books already. The trial court stated again his opinion that, even with the help of these books, the court felt it was not in the defendant's best interest to represent himself. However, the defendant indicated he had thought and prayed about his decision the night before and that he still thought it was in his best interest to forego counsel and represent himself.[134]
In answer to the trial court's questions, the defendant affirmed his understanding that the state had the burden of proof and that he was not required to present a defense, call witnesses or testify. When the trial court asked the defendant if he had thought about the mechanics of how to present a defense, the defendant asked whether he would have standby counsel. The trial court assured the defendant he would have standby counsel. The defendant affirmed his understanding that there were risks and disadvantages to representing himself, but that he still wanted to do so. After some discussion, the defendant evinced his understanding that, if he were found guilty, there would be a penalty phase. He indicated to the court that, while he wanted to represent himself in the guilt phase, he did not want to represent himself in a possible penalty phase.[135] He told the court that he had thought the determination of the penalty was up to the state.[136] When the trial court clarified that he was only asking him these questions in order for the defendant to understand what he was "getting yourself into," the defendant replied, "I understand."[137] The defendant again affirmed that he wanted to represent himself and did not want to be represented by his counsel.[138]
Once again, the trial court obtained the defendant's affirmance of his understanding that he would be confronted by the state and all its resources, that the trial court did not think that he was making the right decision; that he still wanted to represent himself; that there were dangers, risks and disadvantages to representing himself; that he felt that he knew what he *847 was doing in light of his education, work experience and life experience; that there was nothing else he needed to know from the trial court in order to make his decision whether to represent himself and that there was nothing that the trial court could say to persuade him that his best interest would be to continue to be represented by a lawyer. The defendant told the trial court, "I've made up my mind."[139] The defendant indicated to the trial court that he had been taking notes during jury selection, and so was prepared to proceed with voir dire.[140]
The trial court decided to grant, in part, defense counsel's motion, and requested that the defendant select something from legal books that he felt pertained to his case. The trial court made clear that this was not a test. In response, the defendant referred to criminal procedure articles regarding the state's burden of proof and the definition of first degree murder.[141] Prior to taking a brief recess, after which he would make his ruling on the defendant's request, the trial court again obtained the defendant's assent that the defendant desired to waive his right to counsel and represent himself.[142]
Returning after a recess, the trial court made his ruling:
All right. The Court after much prayer and consideration and not convinced that this is in Mr. Campbell's best interest  but the Court is persuaded that he is [sic; has] knowingly, intelligently, and unequivocally expressed to the Court that he does not want to be represented by counsel, he wishes to represent himself, he understands, as far as the Court is concerned, the risks, the dangers, the consequences, he has not changed in his position in terms of what he wants to do, and the Court feels that he understands where we are in these proceedings and what to anticipate, whether or not he fully understands the legal aspects of what he's doing, the Court will grant his motion to self-represent and the Court will now relieve his counsel as primary counsel. The Court, however, will appoint the ID Office as standby counsel for the remainder of this trial.[143]
Subsequent to the trial court's ruling, the defendant conducted the remainder of the voir dire and picked the jury. Several of the defendant's challenges for cause were granted and the defendant successfully blocked one of the state's challenges.

Trial Proceedings
During the guilt phase of trial, the defendant gave an opening statement, cross-examined the state's witnesses, made objections, and gave a closing argument. During the state's questioning of the expert who examined the murder weapon, the defendant objected and the jury was cleared from the courtroom. At that time, the defendant made allegations that his standby counsel was pointing to the jury and the judge, which he interpreted as an attempt by standby counsel to convince the jurors of his guilt. The defendant did not ask the trial court for any specific relief, but indicated his satisfaction with having his observations placed on the record, with having the trial court pay close attention to standby counsel's actions, and with the court's reassurance that he could continue to place his observations on the record.[144]
*848 Prior to the lunch recess after the completion of the questioning of this witness, the defendant placed on the record his observation that he had again seen standby counsel pointing to the court. The defendant requested that standby counsel change seats and, if the defendant needed any help, that he would ask his other standby counsel. The trial court asked if this adjustment in seating was enough or whether the defendant wanted to discuss the matter further in chambers. The defendant responded, "I'm satisfied with discussing with it in open court."[145] The defendant made no further similar allegations during the guilt phase of the proceedings.
After the jury returned with a verdict of guilty of first degree murder, standby counsel filed a motion to re-enroll as counsel for the penalty phase of the trial. Standby counsel provided the defendant with a copy of the motion, asked him to read it overnight, and to think about whether he wanted to continue to self-represent during the penalty phase. Standby counsel informed the court that if the defendant wanted counsel to re-enroll and represent him, then counsel would ask the court to do so. Standby counsel told the court, "I'm familiar with his case, and I'll be ready to proceed in the morning."[146] The next morning, the defendant told the court that he wanted counsel to represent him during the penalty phase of the proceedings.[147] Appointed counsel represented the defendant for the remainder of trial. The defendant made no further allegations of hand gestures or pointing by counsel during the penalty phase.
With this detailed factual background of the defendant's actions and observations both pre-trial and during trial, we turn to the defense's assignments of error raising as issues the competency of the defendant.

Competency to Stand Trial
The defense contends that the trial court abused its discretion in failing to appoint a sanity commission as required by law when, during voir dire, defense counsel raised the issue of the defendant's capacity to proceed. In addition, the defense claims that the trial court abused its discretion by failing to appoint a sanity commission on its own motion, given the defendant's actions during jury selection.
The proper legal standard for determining whether a criminal defendant is competent to stand trial was set forth in State v. Carmouche, XXXX-XXXX p. 29-31 (La.5/14/02), 872 So.2d 1020, 1041-1042, as follows:
A criminal defendant has a constitutional right not to be tried while legally incompetent. Medina v. California, 505 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353, 365-66 (1992) (quoting Drope v. Missouri, 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975)). A state must observe procedures adequate to protect a defendant's right not to be tried while incompetent, and its failure to do so deprives the defendant of his due process right to a fair trial. Id. (quoting Drope, 420 U.S. at 172, 95 S.Ct. at 904, 43 L.Ed.2d at 113); Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966). In his dissent in Medina, Justice Blackmun expressed his opinion that due process does not simply forbid the state to try to convict a person who is incompetent, but it also "demands adequate anticipatory, protective procedures to minimize the risk that an incompetent *849 person will be convicted." Medina, 505 U.S. at 458, 112 S.Ct. at 2584, 120 L.Ed.2d at 371 (1992) (Blackmun, J. dissenting) (emphasis in original); see also State v. Martin, 00-0489, p. 1 (La.9/22/00), 769 So.2d 1168, 1169 (per curiam); State v. Nomey, 613 So.2d 157, 161 (La.1993).
Louisiana's statutory scheme for detecting mental incapacity jealously guards a defendant's right to a fair trial. Nomey, 613 So.2d at 161 (quoting State v. Rogers, 419 So.2d 840, 843 (La.1982)); see also Pate, 383 U.S. at 386, 86 S.Ct. at 842, 15 L.Ed.2d 815, 822 (stating that "Illinois jealously guards this right"). In Louisiana, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La.C.Cr.P. art. 641; see also Nomey, 613 So.2d at 161. Our law also imposes a legal presumption that a defendant is sane and competent to proceed. La. R.S. 15:432; State v. Bridgewater, 00-1529, p. 6 (La.1/15/02), 823 So.2d 877, 888; Martin at p. 1, 769 So.2d at 1169; State v. Armstrong, 94-2950, p. 4 (La.4/8/96), 671 So.2d 307, 309; State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32. Accordingly, the defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial. State v. Frank, 96-1136, p. 1 (La.10/4/96), 679 So.2d 1365, 1366 (citing Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)); Armstrong at p. 4, 671 So.2d at 309; Silman at p. 7, 663 So.2d at 32. A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion. Bridgewater at p. 6, 823 So.2d at 888; Martin at p. 1, 769 So.2d at 1169. Specifically, the appointment of a sanity commission is not a perfunctory matter, a ministerial duty of the trial court, or a matter of right. Martin at p. 1, 769 So.2d at 1169; State v. Nix, 327 So.2d 301, 323 (La.1975). It is not guaranteed to every defendant in every case, but is one of those matters committed to the sound discretion of the court. Martin at p. 1, 769 So.2d at 1169; [State v.] Wilkerson, 403 So.2d [652 (La.1981)] at 658; Nix, 327 So.2d at 323. The Louisiana Code of Criminal Procedure provides that a court shall order a mental examination of a defendant and accordingly appoint a sanity commission when it "has reasonable ground to doubt the defendant's mental capacity to proceed." La.C.Cr.P. art. 643. Reasonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate the proceedings' significance, nor rationally aid his attorney in his defense. State v. Snyder, 98-1078, p. 24 (La.4/14/99), 750 So.2d 832, 851 (quoting Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980)). In the exercise of its discretion, the court may consider both lay and expert testimony before deciding whether reasonable grounds exist for doubting the defendant's capacity to proceed and ruling on the defendant's motion to appoint a sanity commission. Martin at p. 2, 769 So.2d at 1169; Silman at p. 7, 663 So.2d at 32.
The trial court alone has the ultimate decision on the defendant's competence, and that decision is committed to the court's discretion. La.C.Cr.P. art. 647; see Carmouche, supra. Thus, in order to determine whether the trial court in this *850 case abused his discretion in denying defense counsel's motion for a sanity commission, or for failing to order a competency evaluation of the defendant on its own, we must determine whether the defendant's actions raised the possibility that the defendant could neither (1) understand the proceedings against him, (2) appreciate the significance of the proceedings, or (3) rationally aid his attorney in his defense.
In evaluating the legal capacity of the criminally accused, we have stated that the considerations in determining whether the defendant is fully aware of the nature of the proceedings include:
whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction. State v. Bennett, 345 So.2d 1129, 1138 (La.1977).
This court has stated that the facts to consider in determining the defendant's ability to assist in his defense include:
whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial. Id. at 1138.
Here, the defendant passed two court competency tests prior to trial. In addition, Dr. Williams made a detailed assessment of the defendant which considered fully the Bennett factors. However, the language of La.C.Cr.P. art. 641 speaks to present capacity to proceed. Thus, the law would require a re-evaluation of the defendant if there had been a significant change in the defendant's condition between the sanity hearing and trial.
After consideration of the record of the defendant's actions during voir dire, and thereafter, we find that the trial court did not abuse its discretion in failing to grant defense counsel's motion for a sanity commission. We also find that the trial court did not abuse his discretion by failing to order another competency evaluation on its own motion.
In addition to the pre-trial determinations by experts that the defendant was competent to proceed, the court had the benefit of its own interactions with the defendant through his presentation and argument of his pro se motions. Moreover, we find that defense counsel himself, in raising the issue of the defendant's competence "in an abundance of caution," was not convinced of the necessity for making the motion. Defense counsel did not know how to characterize the defendant's actions, whether they were examples of mental illness or just plain "foolishness." The trial court had recently delivered a lecture to the defendant to stop "playing around" and to focus on the proceedings.
We have previously stated that the evidence in the record would support the inference that the defendant has emotional and behavioral problems. We note that the assessments of the defendant while in school noted his disruptive outbursts, problems with authority, and inattention to *851 classroom proceedings. While the defendant's "observations" may fit into the pattern of his previously assessed behaviors, we find it unnecessary to determine the precise cause of the defendant's actions during trial. Instead, whether the defendant was misinterpreting innocuous hand gestures based on his emotional and behavioral problems, distrust of counsel, or wilfulness alone, none of the defendant's behavior evidences an inability on the part of the defendant to understand the proceedings, to appreciate their significance, or to rationally aid his attorney in his defense.
The record shows that the defendant, until he asked to represent himself due to the conflict he had with defense strategy, did not ask for relief based on his "observations." Instead, he merely placed his "observations" on the record. This behavior stopped almost entirely after he began to represent himself.
We find that the record supports the conclusion that the defendant was fully aware of his surroundings and the proceedings in which he was participating. His concerns revolved around what he viewed as efforts by the attorneys to "coerce" the jurors or to manipulate them. The defendant understood the charges against him and the consequences of these charges. The defendant's self-representation demonstrated that he was competent to assist his counsel in his defense. Thus, the record fully supports the conclusion that the defendant was competent to stand trial and that trial court did not abuse its discretion in denying defense counsel's motion to appoint a sanity commission or to do so on its own motion.[148]

Competency to Waive Counsel
The defense contends that the defendant was not competent to waive counsel, that the trial court did not conduct a sufficient colloquy under Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and that the trial court therefore erred in permitting the defendant to represent himself.
The proper legal standard for determining whether a criminal defendant is competent to waive representation by counsel was set forth in State v. Brown, XXXX-XXXX p. 28-29 (La.4/12/05), 907 So.2d 1, 21-22:
Both the Louisiana and federal constitutions guarantee a criminal defendant's right to the assistance of counsel. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); State v. Brooks, 452 So.2d 149, 155 (La.1984). Nevertheless, a defendant may elect to represent himself if the choice is "knowingly and intelligently made" and the assertion of the right is "clear and unequivocal." U.S. Const. Sixth Amend.; La. Const. art. I, § 13; Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); State v. Hegwood, 345 So.2d 1179, 1181-82 (La. 1977).
In Faretta, the United States Supreme Court recognized that a trial court may not force a lawyer upon a defendant when the defendant insists he wants to conduct his own defense and *852 voluntarily and intelligently elects to proceed without counsel. However, he must ask clearly and unequivocally to proceed pro se and he must also make his request in a timely manner. Faretta, 422 U.S. at 835, 95 S.Ct. at 2541. Further, a defendant must be made aware of the dangers and disadvantages of self-representation so that the record demonstrates that "`he knows what he is doing and his choice is made with his eyes open.'" Id., 422 U.S. at 835, 95 S.Ct. at 2541 (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)). Faretta made clear that the accused's "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." Id., 422 U.S. at 836, 95 S.Ct. at 2541.
Our inquiry, therefore, must be to determine whether the record reflects that the defendant knowingly and intelligently chose to represent himself, and whether his assertion of that choice was clear and unequivocal. Whether a defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined on a case-by-case basis, considering the facts and circumstances of each. State v. Leger, XXXX-XXXX p. 53 (La.7/10/06), 936 So.2d 108, 147, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007).
In this regard, the record shows that the trial court did not engage the defendant in only a single colloquy concerning his request to waive counsel and to proceed with self-representation. Instead the record shows three colloquies, two of which were on the record and one in a closed hearing, over two days' time, during which the trial court satisfied itself that the defendant's waiver of his right to counsel and assertion of his right to represent himself was made knowingly, voluntarily and unequivocally.
Here, it was apparent from the record that the defendant had conflicts with appointed counsel, resulting in the filing of pro se motions, none of which were adopted by counsel, including a motion for speedy trial that was in direct opposition to counsel's strategy. Once jury selection began, the conflict between appointed counsel and the defendant became pronounced, with the defendant complaining of counsel's actions and performance. The record reflects that the defendant's request to represent himself and to dismiss appointed counsel during voir dire was clear and unequivocal.
The record also affirmatively reflects that the trial court repeatedly informed the defendant of the pitfalls, risks and consequences of self-representation. Nevertheless, through the three separate colloquies held by the trial court with the defendant, the defendant steadfastly maintained his desire to represent himself and to represent the defense that he wanted.
Although defense counsel contends that the defendant lacked competency to waive counsel, the Supreme Court has rejected any notion that a defendant's competence to waive counsel must be measured by a standard that is higher than a defendant's competence to stand trial. Godinez v. Moran, 509 U.S. 389, 398, 113 S.Ct. 2680, 2686, 125 L.Ed.2d 321 (1993).[149] We have already held that there *853 was no abuse of the trial court's discretion in failing to re-test the defendant's competency to stand trial during jury selection. As Godinez makes plain, once a defendant is determined to be competent to stand trial, and a trial court satisfies itself that the defendant's waiver of his right to counsel is knowing, intelligent and voluntary, constitutional concerns are met:
A finding that a defendant is competent to stand trial, however, is not all that is necessary before he may be permitted to plead guilty or waive his right to counsel. In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary. . . . In this sense there is a "heightened" standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of competence. Id., 509 U.S. at 399-401, 113 S.Ct. at 2687 (emphasis in original).
As long as the record supports the trial court's conclusions that the defendant's waiver of the right to counsel was knowing, intelligent, and unequivocal, we do not review the record for a determination of the defendant's ability to represent himself. "[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to waive the right, not the competence to represent himself." Godinez, 509 U.S. at 399, 113 S.Ct. at 2687 (emphasis in original). Therefore, "a criminal defendant's ability to represent himself has no bearing upon his competence to choose self-representation." Id. (emphasis in original).
This court has held, in State v. Santos, that where a trial judge is confronted with an accused's unequivocal request to represent himself, the judge need determine only whether the accused is competent to waive counsel and is "voluntarily exercising his informed free will." State v. Santos, 99-1897, p. 3 (La.9/15/00), 770 So.2d 319, 321 (quoting Faretta, 422 U.S. at 835, 95 S.Ct. at 2541). Although the defendant's ability to represent himself is not a part of our determination, we note that, while perhaps not as articulate or polished as a lawyer may have been, the defendant nevertheless presented a relevant defense. The defendant successfully challenged prospective jurors and succeeded in blocking a state challenge. He presented an opening statement which challenged the state's case. For state witnesses who could not present direct evidence linking him to the crime, he made the decision to forego cross-examination or, if he did question these witnesses, he pointed out that the evidence they presented did not directly implicate him. For state witnesses who presented direct or eyewitness testimony, he questioned their identification of him due to the witnesses' intoxication or ability. He made and argued objections, some of which were sustained. His closing argument challenged each aspect of the state's evidence against him. While we do not imply that the defendant was as skilled as an attorney, we merely note that the defense did not at any time descend into a *854 farce or a sham. Moreover, the ultimate outcome of the defense presented by the defendant representing himself is not the standard by which we should measure the defendant's right to make the choice to present that defense. As appointed defense counsel stated in the closed hearing, the state's evidence against the defendant was "so strong" that the best result sought by even experienced counsel in the guilt phase of trial was a conviction of second degree murder.
Our review of the record convinces us that the defendant was competent to waive counsel and that the Faretta colloquies held by the trial judge were sufficient for the trial judge to find that the defendant's waiver of his right to counsel and to represent himself was knowing, intelligent, and unequivocal. Therefore, we find no error in the trial court's decision to grant the defendant's request to waive counsel and to proceed to represent himself for the remainder of voir dire and throughout the guilt phase of trial.
Hearsay Issues
Assignments of Error 26-28
The defense contends that the prosecutor introduced impermissible hearsay through the testimony of Detective Bradford when the prosecutor questioned the officer about his investigation. In particular, the defendant complains that, through Detective Bradford's testimony, the state introduced the substance of co-perpetrator James Washington's statement to police, in violation of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Finally, the defendant asserts that the prosecutor used this information, coupled with the testimony of other witnesses, to make improper closing argument in the guilt and penalty phases.
In Bruton, the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his co-defendant's incriminating confession is introduced at their joint trial, finding that the statements of unavailable co-defendants are inherently suspect and presumptively unreliable as substantive evidence against a defendant. See State v. Taylor, XXXX-XXXX (La.1/14/03), 838 So.2d 729, 747-748 n. 12, cert. denied, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). In addition to Bruton, the defense in brief relies also on Lee v. Illinois, 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), in which the Supreme Court held that a codefendant's confession is presumptively unreliable "as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another."
The record shows that the defense failed to contemporaneously object to any of the errors alleged in these assignments of error. Thus, the issue is not properly preserved for review. See La.C.Cr.P. art. 841;[150]State v. Taylor, 93-2201 p. 7 (La.2/28/96), 669 So.2d 364, 369; cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) ("This Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to . . . ".) and State v. Wessinger, 98-1234 p. 20 (La.5/28/99), 736 So.2d 162, 181, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (". . . we hold that we will no longer consider alleged errors occurring in the penalty phase of a capital trial absent a contemporaneous objection."). Although appellate defense counsel *855 contends that the defendant's pro se Motion for New Trial, filed post-verdict, preserved the issue for appeal, such an argument is contrary to law. See State v. Bowen, 292 So.2d 197, 201 (La.1974) (where no objection is made to testimony, defense counsel cannot urge on a motion for new trial the alleged error complained of).
Although we decide this issue on procedural grounds, we note that the record does not support the defense's contentions. We find that Detective Bradford's testimony, which generally summarized the facts the police discovered through their investigation, did not serve as a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. Instead, the officer's testimony, which summarized in a very general sense the statements of eyewitnesses and his own personal knowledge of the defendant,[151] described the course of the investigation which led to the arrest of the defendant. In presenting a general overview of the state's case, or "drawing the full picture" for the jury, the prosecution did not overstep and present impermissible hearsay. State v. Broadway, 1996-2659 p. 8-9 (La.10/19/99), 753 So.2d 801, 809, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000). Finally, each eyewitness who supplied the police with information about the perpetrators was presented by the state at trial and was subject to cross-examination. Thus, even if impermissible hearsay was adduced from Detective Bradford, the information was essentially cumulative of the much more detailed testimonies of the eyewitnesses whose statements served as the basis for Detective Bradford's investigative actions. On this record, it is clear that, if there was error, the error was harmless beyond a reasonable doubt. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); Broadway, 96-2659 p. 24, 753 So.2d at 817 ("The verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial is surely unattributable to the error.").
Insofar as Detective Bradford related his interview with James Washington, the record shows that the officer testified that Washington was arrested with the defendant, that Washington admitted his involvement in the robbery and shooting, and that Washington led police to the murder weapon. At no time did the officer testify that Washington implicated the defendant in the robbery and shooting or that the defendant was the person who used the murder weapon to kill the victim. Detective Bradford testified only as to Washington's own admissions of guilt.
Instead, the officer testified that he believed the defendant was the individual with the gun who shot and killed the victim based on interviews and his own viewing of the surveillance videotape. Appellate defense counsel's argument that the officer's use of the word "interviews" applied solely to Washington's interview with police ignores the fact that there were several eyewitnesses to the defendant's actions that evening in the Magnolia Club and in the *856 getaway car. Our review of the record shows there was no Bruton violation.
Insofar as the defendant complains that the prosecutor in closing argument combined Detective Bradford's testimony regarding Washington's admitted involvement in the crime with the testimony of other witnesses who identified Washington as the other perpetrator, there was no error. The argument was confined to properly admitted evidence and conclusions which the state was allowed to draw therefrom. See La.C.Cr.P. art. 774.[152]
Voir Dire Issues
Assignments of Error 29-38
By his next assignments of error, the defendant challenges several rulings by the trial court pertaining to voir dire on the question of the prospective jurors' ability to consider both a sentence of death and a life sentence.
La. Const. art. 1, § 17 guarantees that "[t]he accused shall have the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of challenges shall be fixed by law." La.C.Cr.P. art. 799 provides the defendant in a capital case with twelve peremptory challenges. "Therefore, when a defendant uses all of his peremptory challenges, a trial court's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence." State v. Cross, XXXX-XXXX p. 7 (La.6/30/95), 658 So.2d 683, 686. Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant exhausts his peremptory challenges. State v. Robertson, 1992-2660 p. 3 (La.1/14/94), 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La.1993).
However, as recent decisions of this court have emphasized, an erroneous ruling on a challenge for cause which does not deprive a defendant of one of his peremptory challenges does not provide grounds for reversing his conviction and sentence. A defendant thus must use one of his remaining peremptory challenges curatively to remove the juror or waive the complaint on appeal, even in a case in which he ultimately exhausts his peremptory challenges. See State v. Blank, 04-0204 p. 25 (La.4/11/07), 955 So.2d 90, 113, cert. denied, ___ U.S. ___, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007) ("In Louisiana, a defendant must use one of his peremptory challenges curatively to remove the juror, thus reducing his remaining peremptory challenges, or waive any complaint on appeal.")(citing State v. Connolly, 96-1680, p. 8 (La.7/1/97), 700 So.2d 810, 818; State v. Bourque, 622 So.2d 198, 229-30 (La.1993); State v. Fallon, 290 So.2d 273, 282 (La. 1974)).[153]
*857 The grounds for which a juror may be challenged for cause are set forth in La. C.Cr.P. art. 797, which sets forth in pertinent part:
Art. 797. Challenge for cause
The state or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his partiality. . . .
* * *
(4) The juror will not accept the law as given to him by the court . . .
The defendant asserts that the trial court failed to grant defense challenges for cause on the basis of the views regarding capital punishment of certain prospective jurors. Additionally, the defendant contends that two of the state challenges for cause were improperly granted.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Manning, XXXX-XXXX p. 38 (La.10/19/04), 885 So.2d 1044, 1082, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). Witt clarified the earlier Supreme Court pronouncement in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), that a prospective juror who would vote automatically for a life sentence was properly excluded by the trial court. La. C.Cr.P. art. 798(2)(a) and (b) incorporate the standard of Witherspoon, as clarified by Witt, and provide:
It is good cause for challenge on the part of the state, but not on the part of the defendant, that
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; . . .
In a "reverse-Witherspoon " situation, the basis of the exclusion is that a prospective juror "will not consider a life sentence and . . . will automatically vote for the death penalty under the factual circumstances of the case before him . . .". Robertson, 1992-2660 p. 8, 630 So.2d at 1284. The "substantial impairment" standard applies equally to "reverse-Witherspoon " challenges. Manning, XXXX-XXXX p. 38 n. 22, 885 So.2d at 1083 n. 22. Thus, if a potential juror's views on the death penalty are such that they would prevent or substantially impair the performance of his duties in accordance with his instructions or oaths, whether those views are for or against the death penalty, he should be excused for cause.
*858 In reviewing the cause challenges, we note that a trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Cross, XXXX-XXXX at p. 7, 658 So.2d at 686; Robertson, 1992-2660 at p. 4, 630 So.2d at 1281. Even so, this court has cautioned that a venireman's responses cannot be considered in isolation and that a challenge should be granted, "even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably [inferred]." State v. Jones, 474 So.2d 919, 929 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986). Yet a refusal to disqualify a venireman on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence. State v. Howard, XXXX-XXXX p. 7-10 (La.4/23/99), 751 So.2d 783, 795-97, cert. denied, 528 U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999); Robertson, 630 So.2d at 1281.

Debra Roberts
The defendant claims that Debra Roberts, who ultimately did not serve on the jury, indicated that she would be rigid in her decision to impose the death penalty in the context of a murder with specific intent to kill during an armed robbery. Specifically, when asked by the district attorney to express how she felt about the death penalty, Roberts stated:
This is interesting because before I walked in here today I was an advocate of the death penalty, and when you put a human face to it the wheels start turning. But then again, I thought about we'll see. If I'm chosen, we're going to see the faces of the victim's family and the friends that are left behind, so I think I could make a fair and impartial decision.[154]
Roberts went on to explain, after being asked if it would be hard or difficult for her to return a verdict of death, that "I think if it wasn't hard or difficult I wouldn't be a person, you know, that's a really big decision, takes a lot of soul searching."[155] She then reiterated that imposing a death sentence ". . . would be difficult but I could do it," yet she would also consider the punishment of life imprisonment.[156]
During questioning by defense counsel, Roberts stated that, in general, she could consider imposing a sentence of life imprisonment. However, in the case of an intentional killing of someone during an armed robbery, she agreed that she would "lean more towards the death penalty."[157] She explained that there are "different factors" to consider, but generally she believed "the death penalty should be imposed for someone convicted of that crime."[158] Roberts agreed that it would be difficult for her to consider a life sentence for someone convicted of intentionally killing a person during an armed robbery, and agreed with defense counsel that there was nothing the judge or defense counsel could say that could change her mind.[159] When the *859 state requested an opportunity to recall Roberts for individual voir dire to clear up her last statements due to the way defense counsel phrased the question, the trial judge ruled, "Well, if that's the purpose I don't think we need to call her back in. The Court will deny that request."[160]
The record reflects that the trial court denied defense counsel's challenge for cause as to Roberts because her belief that it would be "difficult" to impose a life sentence in a case involving specific intent to kill and armed robbery does not rise to the standard of "substantially impaired" as set forth in Witherspoon, supra. The trial court's reasoning appears correct. Roberts did not express an intention to vote "automatically" for death; nor, when viewed in its entirety, did her responses indicate that she had opinions that would prevent or substantially impair the performance of her duties as a juror. Rather, she expressed her sentiment that a decision to vote for the death penalty would be both "hard" and "difficult", and would require "soul searching." Her responses did not indicate that she would refuse to perform her duties as a juror in accord with her oath. Thus, the trial court properly denied the defense challenge for cause as to Roberts.

Jerry Payne
The defendant next complains of the trial court's denial of a cause challenge exercised against Jerry Payne, who subsequently served on the jury. Specifically, the defendant argues that Payne indicated that he would refuse to consider mitigating circumstances and would only consider a life sentence when the murder was "justified." When asked his feelings about the death penalty, Payne responded:
I think of the death penalty as necessary to the degree that the murder was unnecessary. The brutality, the savagery, the unnecessity [sic] of the killing. Obviously, the mitigating factors with me have a bearing, some have no bearing on that list with me, but some could have a bearing with me.[161]
When the prosecutor asked further questions about Payne's ability to consider the mitigating circumstances that might be presented, Payne replied:
I'm an opinionated person, but before I make an opinion I try to pull all the factors in. And just reading those seven things [mitigating circumstances], and I understand there can be many other factors, but just reading some of those, for example, the first one up there no significant prior criminal history, depending on the savagery of the murder, that may or may not have any significance with me.[162]
The prosecutor continued, reiterating that Payne had just said that the mitigating factor "may or may not" have significance. Payne responded "absolutely" and indicated that he would still consider the information.[163] Although he candidly admitted "it hasn't got much of a chance if it's a savage murder," he reiterated "but I will consider it."[164] Payne stated that he would require there to be strong evidence of a mitigating circumstance to prove to him that those considerations were a factor in the decision.[165] However, when asked point-blank whether he could consider imposing a life sentence, Payne responded, "sure" and indicated he could consider either *860 a life sentence or the death penalty.[166] In addition, Payne told the prosecutor that he could vote for a death penalty, "but I won't do it because 11 other people felt that way. I believe this is 12 separate decisions that would have to be made."[167]
Defense counsel engaged in an extended colloquy with Payne. When defense counsel asked Payne to describe several aspects of his feelings about the death penalty, Payne responded:
Well, that's about an hour long speech. I think it is necessary. I have to believe that when someone is intending to commit a murder, it has to be in their mind that there could be the death penalty involved. They probably never think that they're going to get caught or they're too angry or whatever the situation, but I still think that it is a deterrent. Are there downsides to it, sure. If someone is convicted wrongly, then that's a horrible situation. But some of the savagery and some of the brutality that we see in murder, just the callousness I think make the death penalty extremely necessary. I don't have reservations about invoking the death penalty on someone if the situation is warranted.[168]
When defense counsel inquired further as to what type of situation would justify a death penalty, Payne responded "if it's brutal" or "they meant to do it." He further explained "[i]f they have enough faculties about them and their thought process to know that they're intending to do it, then I think the death penalty is appropriate."[169] When asked by defense counsel if he could be considered a person who was "middle of the road" as far as when the death penalty should be imposed, Payne replied, "I think that we've got to be reasonable."[170] He reiterated, however, "Again, it's very hard to be reasonable when it's a brutal situation."[171] Payne admitted to defense counsel that he would have "much difficulty" imposing a life sentence in a case where the murderer engaged in "overkill."[172]
Defense counsel asked Payne if he leaned one way or the other as far as imposing the death penalty or a life sentence for an armed robbery and an intentional killing. Payne replied "[t]hat's fully hard to answer that because I don't know the real facts of the case."[173] Finally, as defense counsel began to ask yet another question on this issue, Payne answered:
I'm open to anything, okay. But it's going to be very difficult. Again, I once said during the mitigating, if you use mitigating circumstances with me, you're going to have to prove them beyond a really reasonable doubt. I mean, I hear a doctor come in and say the person is mentally ill, you're going to have to make me understand that really good for me to accept that.[174]
When defense counsel asked whether Payne could consider mitigating circumstance if instructed to do so by the judge, even if the mitigating evidence was far less than beyond a reasonable doubt, he answered, "Yes, I would consider it."[175]
*861 Defense counsel then pressed Payne further, asking "[n]ow, in terms of considering it, could you use a mitigating circumstance that has not been proven beyond a reasonable doubt as an actual reason for imposing a life sentence?"[176] Payne responded, "I'd just have to see the situation, I don't know that I could do that."[177] Defense counsel followed up with: "So the answer is it would depend?"[178] Payne answered, "[i]t sure would."[179] Payne described to defense counsel that he would expect a beyond a reasonable doubt level of proof of mitigating circumstances before the circumstances "would make certain that I would give them life rather than death."[180]
When asked to describe his feelings about a life sentence, Payne indicated:
I think that's a tough sentence assuming they don't get out of prison. I have to consider the victim in that, also, and I think that the death penalty is going to put an end to it for that person, for the two people, the victim and the accused, but that doesn't end it for the other folks. I don't like this term closure because I don't think there is closure. On the other hand, a life sentence, I think the reason we should send people to prison is so we can redeem them. And if you're sending them for life with no parole, redemption is not necessary because they're not ever going to get out anyway.[181]
Defense counsel then asked if a life sentence was nevertheless an extremely severe punishment. Payne replied "[m]ost definitely, particularly if there's no parole," and "that's a real punishment," although acknowledging a life sentence was "not quite as tough as death, the death penalty, of course."[182] In determining whether someone who had committed first degree murder should receive the death penalty or life imprisonment, Payne indicated that he would want to know whether the person intended to commit the crime through callousness or meanness.[183]
When asked later whether religious ideas about redemption were valid considerations for a life sentence, Payne replied:
They're all considerations, but I, too am a religious person, but you know, you can be forgiven just before you are executed, too. . . . So I don't have a problem with life imprisonment, but it has to be a pretty good standard for me to get out of the death penalty, assuming the kinds of crime that I have discussed previously about the brutality, the savagery, the callousness, the intent, the meanness. Mitigating circumstances are going to have to prove to me that life imprisonment is deserving.[184]
Finally, Payne indicated that anger was not an excuse for a first degree murder.[185]
Defense counsel challenged Payne for cause arguing that he would require the defense to prove mitigating circumstances beyond a reasonable doubt; thus, holding the defense to a higher burden than was required by law.[186] The state objected. *862 After listening to the argument of counsel, the trial court denied the defense challenge for cause as to Payne.[187]
Considering the whole of Payne's voir dire testimony, we do not find any abuse of the trial court's discretion in denying the challenge for cause. Payne's willingness to follow the court's instructions combined with his willingness to impose life imprisonment or the death penalty, depending on the circumstances, negated the defense's inference that Payne was biased, prejudiced, or unable to render a judgment according to law. Thus, the trial court properly denied the defense challenge for cause.

Daniel Jarosek
The defendant asserts that Daniel Jarosek, who ultimately sat on the jury, would presume that the defendant has specific intent to kill if the defendant participated in a robbery with a weapon, during which someone was killed. The defense argues that Jarosek was unwilling to follow the law and should have been removed from the jury on the defense's cause challenge.
In response to defense counsel's question whether ". . . simply because a robber uses a gun during a robbery, you necessarily assume that he had the intent to kill," Jarosek responded affirmatively.[188] Nevertheless, defense counsel later posed the following question to another prospective juror:
Assuming you have two possibilities in the case, all the evidence is in, one possibility is that it was an intentional shooting and the other possibility was it was an accidental shooting, and they're both reasonable, what would your verdict have to be?[189]
Defense counsel relied upon this same question to elicit a response from Jarosek, who agreed that his answer would be second degree murder.[190] This question was repeated later, and again asked directly to Jarosek, who responded "[s]econd degree."[191]
The defense raised a challenge for cause as to prospective juror Jarosek.[192] Thereafter, the record reveals that defense counsel, the district attorney, and the trial court spent considerable time discussing whether Jarosek clearly indicated that he held an automatic presumption that the defendant had specific intent to kill.[193] In his plea to the trial judge, defense counsel reminded the court that he had earlier successfully challenged for cause prospective juror Fischer on the same grounds and suggested that Jarosek should have been struck, also. However, a review of the record does not show that Fischer was questioned further or rehabilitated as Jarosek was. Accordingly, the trial court properly refused to grant the defendant's challenge for cause.

Mary Bolin
The defendant contends that the trial court improperly granted the state's challenge for cause as to prospective juror Mary Bolin on the ground that she could not impose the death penalty. However, a review of the record reveals that the defense did not contemporaneously object to the trial court's ruling. Indeed, the record reflects that defense counsel *863 agreed with the district attorney's basis for exclusion of Bolin:
STATE: Your Honor, we would challenge Ms. Bolin for cause. She said that although she believed in the death penalty she could not impose it. And I think the Court after she said that she broke down, she came to the realization that she could not impose the death penalty.
DEFENSE: That's correct, Your Honor, no objection.[194]
We hold that this issue was not properly preserved for review by this court. Taylor, 93-2201 p. 7, 669 So.2d at 369. Moreover, the above exchange illustrates a separate and sufficient basis for Bolin's exclusion, as it appears she experienced some sort of emotional episode when faced with the responsibility of potentially imposing the death penalty. Accordingly, the trial court properly granted the state's challenge for cause as to this prospective juror.

Rosie Lee
The defendant challenges the trial court's decision to grant the state's challenge for cause as to Rosie Lee. When the prosecutor asked the group of prospective jurors if there was anyone among them who could not impose the death penalty because of personal or religious beliefs, Lee answered that she could not. She explained: ". . . it's against my religion. I don't believe you should take a person's life. I think they should be put up in a place where they can be rehabilitated or life in prison."[195] When asked if her opposition to the death penalty would remain the same, regardless of the evidence, she concluded that she would "have to really pray about it and see the evidence before I could vote to take a man's life or a woman's life."[196]
Later, the district attorney returned to Lee, who acknowledged that it would not be fair to the other jurors if someone who was opposed to the death penalty under any circumstance sat on the jury. Taking that sentiment into consideration, the district attorney then asked her again if she could consider the death penalty. Lee answered, "No, I could not decide to take a man['s] life"[197] and "I couldn't do the death penalty on no man or no woman."[198] The district attorney continued to question Lee about her opinion and she consistently and adamantly claimed that she could not impose the death penalty.
Upon questioning by defense counsel, Lee acknowledged her "strong feelings" against the death penalty. When pushed to articulate circumstances where she would impose the death penalty, Lee concluded that she would only do so if it was "outright evil" such that "[the defendant] had no compassion, beat to death, really angry, then after that killed and all that, like they was tortured or something."[199] Under these circumstances, Lee acknowledged, for the first time during voir dire, that she would "consider" the death penalty. However, she qualified her admission by suggesting that she would also consider "the age factor" before coming to the decision.[200]
When asked by defense counsel if she could sit on the jury, even with her strong feelings, and consider the death penalty *864 for someone convicted of an intentional murder, Lee responded, "Yes, I could sit on a death penalty [case] and consider it and think about it and pray about it and come up with a decision."[201] But when pressed to clarify whether she could render a death verdict for such a person, Lee replied, "[i]f they could prove that he was a  was really like a torture, a bad serious, really didn't have no conscious [sic] about killing nobody, yes, sir."[202]
After the state challenged Lee for cause, the trial court acknowledged that her answers to the state had been forthright in her inability to consider the death penalty under any circumstances. Although the trial court was aware of Lee's admission that she would consider the death penalty if it were a case of "outright evil," the trial court indicated his satisfaction that the totality of Lee's responses indicated an inability to impose the death penalty.[203]
We find no abuse of the trial court's discretion in granting the state's cause challenge as to prospective juror Lee. Much deference "must be afforded to a trial court's first-hand observation of tone of voice, body language, facial expression, eye contact, or juror attention." State v. Leger, 2005-11 p. 90 (La.7/10/06), 936 So.2d 108, 169, cert. denied, ___ U.S. ___, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). This court has previously held "significantly, it is in the determination of substantial impairment that the trial judge's broad discretion plays the critical role." Id., citing State v. Lucky, XXXX-XXXX p. 7 (La.4/13/99), 755 So.2d 845, 850, cert. denied, 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000). Lee's admission that she would consider the death penalty under certain extreme circumstances is outweighed by her consistent statements during the majority of voir dire that she would not impose the death penalty under any circumstance. As a result, the trial court properly granted the state's challenge.

Twenty Named Prospective Jurors
The defendant argues, generally, that the trial court improperly granted the state's challenges for cause as to twenty jurors simply "based upon their opposition to the death penalty."[204] A review of the record reveals that defense counsel did not merely stand silent at the time of the state's cause challenges, but clearly stated "no objection" to eighteen of the twenty challenges.[205] On the last day of voir dire, the defendant had taken over his defense, and he also stated "no objection" to the final two of the state's cause challenges raised here.[206] The failure of defense counsel and the defendant himself to object to the court's granting of the state's challenges for cause waived any complaint in this regard on appeal. See La.C.Cr.P. art. 841; Taylor, 93-2201 p. 7, 669 So.2d at 369. Moreover, we find nothing in the record, and defense counsel fails to point to anything specific to this record, which would lead us to believe that there had been an abuse of the trial court's discretion in granting the state's challenges for these prospective jurors.

Partial Jury
The defendant also generally asserts that he was tried by a partial jury. *865 Specifically, he maintains that the jury included three jurors "who believed that death was the only appropriate punishment for someone convicted of first degree murder."[207] This claim is not properly preserved for appeal because defense counsel failed to challenge the seating of these jurors. See La.C.Cr.P. art. 841; Taylor, 93-2201 p. 7, 669 So.2d at 369. Although we decide this issue on procedural grounds, we note that a review of the record shows that the defendant's allegations are baseless.
Prospective juror Claude Johnson, when asked how he felt about the death penalty, stated, "I'm for the death penalty."[208] However, he also stated that he could consider both the death penalty and life imprisonment along with considering any and all mitigating factors that may be presented to the jury.[209] During defense questioning, Johnson indicated he would not automatically vote for death[210] and indicated he was "in the middle" when asked if he leaned more toward one penalty than the other.[211] The record shows that Johnson repeatedly stated that he could impose a life sentence for an intentional killing during an armed robbery.[212]
Prospective juror Anita White gave equally balanced responses to questioning by both the prosecutor and defense counsel, indicating that although it may be difficult for her, she could consider a life sentence for someone convicted of first degree murder.[213] Although White testified she might "lean heavily" toward imposing the death penalty, she did not believe her feelings were so strong as to impair or affect her ability to impose a life sentence.[214]
Finally, although prospective juror Leroy Jett articulated a belief that "if you take someone's life, then you shouldn't have a right to live no way,"[215] he also agreed that he could act according to the law and consider a sentence of life imprisonment for someone who has been convicted of first degree murder in the course of an armed robbery.[216] The defendant's suggestion that the jury was not impartial, based upon the responses of prospective jurors Johnson, White, and Jett, is baseless.
Motion to Suppress Identification
Assignment of Error 39
The defendant argues that the trial court erroneously denied his motions to suppress the pretrial identifications made by Burkette, Holloway, and Jackson. Specifically, the defendant maintains that the identifications were made as a result of suggestive procedures, and are, therefore, unreliable.
The record show that defense counsel filed a pretrial motion to suppress identification on August 16, 2002, and an amended motion to suppress identification on November 27, 2002. These counseled motions challenged the identifications made by Burkette and Holloway, suggesting that they were made "under circumstances that suggested that he [the defendant] was the perpetrator of the crime."
*866 A hearing on the motions was held on February 13, 2003, during which testimony was taken from Holloway, Burkette, and Jackson. Subsequent to the hearing, the trial court denied the motions. Thereafter, the defendant filed a pro se document entitled "Supplemental Attachment Motion to Suppress" on August 12, 2003, again challenging the identifications made by Burkette and Jackson. The trial court denied the defendant's pro se motion on June 15, 2004. After trial, the defendant filed a pro se motion to suppress identification on November 24, 2004, which the trial court considered as a motion for new trial. After oral argument, the trial court denied this motion.
In State v. Higgins, XXXX-XXXX (La.4/1/05), 898 So.2d 1219, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005), this court held:
as a general matter, the defendant has the burden of proof on a motion to suppress an out-of-court identification. La. Code Crim. Proc. art. 703(D). To suppress an identification, a defendant must first prove that the identification procedure was suggestive. . . . An identification procedure is suggestive if, during the procedure, the witness's attention is unduly focused on the defendant. . . . However, even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure.
Id., XXXX-XXXX p. 19, 898 So.2d at 1232-1233.
In Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), the Supreme Court held that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.

Virginia Burkette's Identification
At the hearing of defense counsel's motion to suppress held February 13, 2003, Burkette testified that she had known the defendant and Washington for approximately "two or three" weeks before the shooting. Burkette speculated that she saw the defendant nearly every day for about two weeks. Burkette explained that she had occasion to come into frequent contact with the defendant because he and Washington were assisting her as she moved residences. In fact, both men slept at her house on occasion during the time that they were helping her move.
Burkette testified that on February 11, 2003, she came into contact with the defendant after receiving a call from Washington asking her to pick him and the defendant up in her car and "take them to the Line to get something to drink." Burkette agreed and met Washington and the defendant at Holloway's apartment that evening.
Upon arriving at the Magnolia Club later that evening, after several other stops, Burkette watched the defendant, carrying a shotgun, and accompanied by Washington, walk into the Magnolia Club. Burkette recalled that when the men returned to the car, they both had money in their *867 hands. After the defendant entered the car, "Laderick said he just shot that white bitch's head off." Burkette testified that she was positive that the defendant was the same man that she picked up at Holloway's apartment earlier that evening and the same man who entered the Magnolia Club with a shotgun and returned from the Magnolia Club with a shotgun and cash.
Burkette admitted at the suppression hearing that she was unable to identify the defendant in a photographic lineup presented to her by police. She explained that the pictures shown to her were too dark and that she told the officers that during the lineup procedure. Burkette denied that the police ever suggested to her that the defendant was involved in the shooting. Burkette made in-person identifications of the defendant at the motion to suppress as well as at trial.
The defendant suggests that Burkette was coached by police during the pretrial photographic lineup, thus tainting her in-court identification. In support, the defendant points to an exchange between Burkette and Detective Long during Burkette's initial statement to police on February 13, 2002. The statement shows that Burkette immediately identified Washington but was unable to identify the defendant from a photographic lineup. During the portion of the exchange indicated by defense counsel, Detective Long suggested to Burkette that she may recognize the No. 2 photo, but Burkette rebuffs the suggestion, saying: "Number two's too dark. He was more light skinned. He was light skinneder [sic] than Peanut. I mean, I just really never paid attention to him but he was light skinneder [sic] than Peanut. And I always saw him with a Army Jacket."[217]
The transcript of the entirety of Burkette's initial statement to police puts the portion of the exchange referred to by defense counsel in context. Earlier in the exchange, Burkette had referenced the photograph in the No. 2 position as possibly being that of the defendant, Washington's cousin and the person she saw in the surveillance videotape.[218] The transcript shows that Detective Long was returning to his questioning of Burkette about the No. 2 photograph after he and Burkette discussed other issues. The exchange does not appear "out of the blue," nor does the exchange lend support to the defense's intimation that Burkette was coached. Moreover, even if Burkette was coached by the officer showing her the photographic lineup, the coaching proved to be ineffective. Burkette held her ground and would not make an identification of the defendant from the photographic lineup presented to her by police.
We find that Burkette's suppression hearing testimony and trial testimony supports the authenticity of her in-court identification at trial. Further, we find her inability to earlier identify the defendant from a photographic lineup to be inconsequential. Nothing in the exchange relied upon by the defense supports the conclusion that Burkette was coached into identifying the defendant or that her subsequent identification was made as the result of suggestive police procedure. The trial court did not err by refusing to suppress Burkette's testimony.

Cardell Jackson's Identification
The defendant challenges the reliability of Jackson's in-court identification of the defendant as the shooter, characterizing his testimony as "weak and inconsistent with regard to how he actually identified *868 Mr. Campbell at the crime scene."[219] The defendant contends that Jackson's lack of certainty undermines the validity of the identification, and hypothesizes that Jackson was easily able to identify the defendant in court because Jackson had known the defendant since the defendant was a child.
At the suppression hearing, Jackson testified that he had known the defendant and his family since the defendant's birth. Because the town of Rodessa is so small, Jackson explained that he would see the defendant regularly, whether at "his aunty house or at the store or standing on the side of the road. . . ."
Jackson testified at the hearing that on the evening of February 11, 2002, he was playing video poker at the Magnolia Club. He explained that he did not initially know that a robbery was taking place, but he suspected as much when he heard a voice say "give me all the money." Jackson immediately recognized the voice as that of the defendant. He agreed that the words spoken by the defendant were uttered in a somewhat loud fashion and were clear, so that he could distinctly recognize whose voice it was. Jackson was certain the voice he heard was that of the defendant.
After hearing the defendant's voice, Jackson turned from the video poker machine toward the unfolding robbery. Jackson did not see the features of the person who spoke; instead, he saw the man's back and a side of the profile of his face. In addition, Jackson saw the man's posture, height and "the way he [was] built."[220] Jackson explained he ". . . saw something about him that I know it was him, what it was I can't put my finger on it but I saw something that made me knew it was Laderick Campbell."[221]
Jackson gave Detective Bradford two names, James Washington and LaDerrick Campbell. He was not shown a photograph of the defendant by Detective Bradford. Jackson denied that the Sheriff's Department ever told him who the suspects were in the matter or that he was influenced in any way to suggest that it may have been the defendant or Washington in the Magnolia Club that evening.
The defendant offers no suggestion that Jackson's testimony was influenced by the police or was induced by suggestive identification procedures. Instead, the defendant merely maintains that Jackson's identification lacked certainty. To the contrary, the record shows that Jackson's testimony and statement to police were unequivocal. He recalled knowing the defendant for all of the defendant's life, recognizing his voice that night at the Magnolia Club, and recognizing certain features of the defendant during the robbery. The defendant fails to show how Jackson's testimony is unreliable and subject to suppression. The trial court properly denied any motion to suppress his identification of the defendant.

Lakischa Holloway's Identification
The defendant states that Holloway's identification was made as a result of suggestive identification procedures, but fails to brief the issue or point to any specific instance that he believes tainted her identification.
A review of the record reveals that, at the suppression hearing, Holloway positively identified the defendant. Holloway explained that on the night in question, she, Burkette, Washington, and the defendant drove to the Magnolia Club in Burkette's *869 car. Holloway denied seeing the defendant with a gun. She did, however, recall that when the defendant returned to the car from the Magnolia Club, she heard him say ". . . I think I shot her. . . ."[222] Holloway testified that she was shown a photographic lineup by the Caddo Parish Sheriff's deputies, and from the lineup she positively identified the defendant and Washington.
We find that nothing in Holloway's testimony indicates that she was coached or subject to suggestive identification procedures. Indeed, the record shows that she was unequivocal in her identification of the defendant and Washington as the men in the car with her that evening and that the defendant was the man who told her, upon his return from the Magnolia Club, that he shot the white lady. The trial court properly denied the motion to suppress Holloway's identification.
Even assuming the line-ups shown to Burkette and Holloway were suggestive, however, the defendant fails to demonstrate that Burkette or Holloway misidentified him. Burkette and Holloway were unwavering in their positive identifications of the defendant. Although not shown a photographic line-up, Jackson was positive with his voice identification. None of these witnesses was attempting to identify a stranger that they had seen only for the short time of the robbery and shooting. Instead, Jackson had known the defendant for all of the defendant's life. Holloway had known the defendant for a number of years. Even Burkette had known the defendant for some weeks before she made her identification. Based on the totality of the circumstances, we find no substantial likelihood of misidentification. The trial court did not err in denying the motions to suppress the identifications.
Indictment Issues
Assignments of Error 40-42
The defendant challenges the jurisdiction of this Court to entertain his appeal based on two alleged errors in the grand jury indictment which charged him with first degree murder. Specifically, the defendant maintains that the bill of indictment fails to contain a true bill endorsement by the grand jury foreperson, resulting in an invalid indictment, and that the short form indictment used in this matter is constitutionally insufficient under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
With regard to the defense's claims that the record does not contain an indictment signed by the grand jury foreperson, we note that the record was supplemented subsequent to the submission of this case to the court. The back of the original grand jury indictment contained in the trial court record, which was signed by the grand jury foreperson and indicates that a true bill was returned, is now a part of the appellate record.[223] Thus, the defendant's alleged error is factually inaccurate.
Insofar as the defendant complains that the short form indictment is constitutionally insufficient because it fails to list aggravating factors necessary to a first degree murder or the aggravating circumstances necessary to impose a death sentence, this court has addressed this argument before in capital cases and rejected it:
The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La.1979). A post-verdict attack on the *870 sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. State v. Williams, 480 So.2d 721, 722, n. 1 (La.1985); La.C.Cr.P. art. 465, Official Revision Comment (a). Given counsel's failure to file a motion to quash, the defendant arguably waived any claim based on the allegedly defective indictment.
Notwithstanding the procedural bar to the claim, the Louisiana Constitution of 1974 provides that an accused shall be informed of the nature and cause of the accusation against him. La. Const. Art. I, § 13. That requirement is implemented by La.C.Cr.P. art. 464, which provides:
The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. The constitutionality of short forms has been consistently upheld by this Court. State v. Baylis, 388 So.2d 713, 718-19 (La.1980); State v. Liner, 373 So.2d 121, 122 (La.1979). When those forms are used, it is intended that a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. Baylis, 388 So.2d at 719; State v. Johnson, 365 So.2d 1267, 1270-71 (La.1978); La.C.Cr.P. art. 465, Official Revision Comment (a).
State v. Draughn, XXXX-XXXX p. 60-61 (La.1/17/07), 950 So.2d 583, 623-624, cert. denied, ___ U.S. ___, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
As in Draughn, the record in this case shows that the defense failed to file a pretrial motion to quash which complained of the short form indictment.[224] The short form indictment which charged the defendant read, in pertinent part, that ". . . on or about the 11th day of February, 2002 . . . Laderick Campbell committed the offense of First Degree Murder as defined by LSA-R.S. 14:30 in that he committed first degree murder of Kathy Parker."[225] Accordingly, the defendant was charged in compliance with LSA-C.Cr.P. art. 465(A)(31), which provides as a short form indictment for first degree murder: "A.B. committed first degree murder of C.D." See State v. Neslo, 433 So.2d 73, 81-82 (La.1983). Additionally, a bill of particulars was filed by the defendant and answered by the State, pre-trial discovery was performed, and several pre-trial hearings and preliminary examinations were conducted. Under these circumstances, it is abundantly clear that the defendant was informed of the charges against him.
Jury Instruction Issues
Assignments of Error 43-45
The defendant argues that the trial court's instructions to the jury on reasonable doubt, specific intent and the gubernatorial power of commutation invited the jury to consider arbitrary factors in *871 their determination of guilt and the appropriate penalty. We note that no objection was made to any of these jury charges at either the guilt phase or the penalty phase of trial. Thus, these issues are not preserved for our review. La.C.Cr.P. arts. 801,[226] 803; see Taylor, 93-2201 p. 7, 669 So.2d at 369; Wessinger, 98-1234 p. 20, 736 So.2d at 181.
Although we decide this issue on procedural grounds, we note that the record does not support the defendant's argument. The reasonable doubt instruction, given prior to the jury's deliberations on guilt, did not allow the jury to convict without satisfying the reasonable doubt requirement. Thus, the instruction passes constitutional muster, and the defendant's argument fails. State v. Williams, XXXX-XXXX, p. 18 (La.1/21/98), 708 So.2d 703, 718, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998) (upholding a similar instruction which equated reasonable doubt with "a serious doubt for which you could give good reason").
The instruction on specific intent, given before the jury deliberated on the defendant's guilt, did not set out a prohibited conclusive presumption, but rather instructed that the jury "may infer" specific intent from the defendant's actions. The permissive language used in this case has been previously sanctioned by this Court. See State v. Mitchell, 1994-2078, p. 5 (La.5/21/96), 674 So.2d 250, 255, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996); State v. Copeland, 530 So.2d 526, 539 (La. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989).
Finally, the defendant contends that the constitutionally and statutorily mandated instruction regarding the governor's commutation power, given prior to the jury's deliberation on the appropriate sentence, introduced an arbitrary and capricious factor into the jury's sentencing decision. The defendant requests that this Court reconsider its ruling in State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321, which upheld as constitutional the application of LSA-.C.Cr.P. art. 905.2(B).[227] In Loyd, this court found that "Louisiana's [commutation] instruction is an even-handed one which accurately informs jurors that a death sentence as well as a life sentence remains subject to executive revision." Loyd, 689 So.2d at 1331. The defendant *872 presents nothing which would lead us to re-examine our previous holding in Loyd.
Death Penalty Issue
Assignment of Error 46
The defendant claims that the trial court's failure to instruct jurors that they must unanimously determine beyond a reasonable doubt that death is the appropriate punishment violates Ring v. Arizona, supra. As previously noted, defense counsel lodged no objection to the penalty phase jury instructions; thus, this issue is not preserved for review. La. C.Cr.P. art. 841; Wessinger, 98-1234 p. 20, 736 So.2d at 181.
Although we decide the issue on procedural grounds, we note that the court has recently rejected this same argument in Blank, 2004-204 p. 26, 955 So.2d at 140:
However, Ring requires only that jurors find beyond a reasonable doubt all of the predicate facts which render a defendant eligible for the death sentence, after consideration of the mitigating evidence. Id., 536 U.S. at 609, 122 S.Ct. at 2443. While defendant now argues that Ring should extend such a requirement to the ultimate sentence as well as the predicate facts, neither Ring, nor Louisiana jurisprudence for that matter, requires the jurors to reach their ultimate sentencing determination beyond a reasonable doubt. State v. Koon [, XXXX-XXXX (La.5/20/97), 704 So.2d 756], supra at 772-73 ("Louisiana is not a weighing state. It does not require capital juries to weigh or balance mitigating against aggravating circumstances, one against the other, according to any particular standard.") (citations omitted).
Appellate Record Completeness
Assignment of Error 48
The defendant asserts that the lack of a complete appellate record requires reversal of his conviction and death sentence. Specifically, he claims that transcripts of numerous court appearances, hearings and bench conferences are omitted from the appellate record. He also suggests that record omissions during voir dire render it difficult to establish the viability of cause challenges.
La. Const. art. I § 19 guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." Additionally, La.C.Cr.P. art. 843 provides in pertinent part:
In felony cases, . . . the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
In support of his argument, appellate counsel cites State v. Landry, XXXX-XXXX (La.6/29/99), 751 So.2d 214. In Landry, this Court reversed a conviction and death sentence because the appellate record was so deficient that the Court could not properly review the case for error. Landry, XXXX-XXXX, pp. 1-4, 751 So.2d at 214-16. Even though this Court has found reversible error when material portions of the trial record were unavailable or incomplete, a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal" does not require reversal of a conviction. Draughn, XXXX-XXXX p. 63, 950 So.2d at 625; State v. Castleberry, XXXX-XXXX p. 29 (La.4/13/99), 758 So.2d 749, 773, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999), quoting State v. Allen, XXXX-XXXX (La.9/5/96), 682 So.2d 713 (internal citation omitted). An incomplete record may be *873 adequate for appellate review. Castleberry, XXXX-XXXX p. 29, 758 So.2d at 773; State v. Hawkins, XXXX-XXXX p. 8 (La.1/14/97), 688 So.2d 473, 480. A defendant will not be entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. Id.
Defense counsel contends that the fact that the defendant represented himself at trial, coupled with the issues raised regarding the defendant's competency, necessitate a complete and accurate record since the defendant lacks the ability to provide important information to his appellate counsel. However, the defense offers no suggestion or argument that the defendant was prejudiced by the record omissions.
With regard to unrecorded bench conferences, the court has previously stated:
This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. . . . Similarly, Art. 1, § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.
Draughn, XXXX-XXXX p. 63-64, 950 So.2d at 625, citing State v. Hoffman, XXXX-XXXX p. 50 (La.4/11/00), 768 So.2d 542, 586-587, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000). As in Draughn, the record shows that the trial court placed on the record, outside of the jury's presence, the substance of certain bench conferences for objections which the trial court deemed substantive. As for other bench conferences, not all of them were placed on the record. In one instance, the trial judge noted "because they were objections by defense counsel which were sustained and the State agreed, then the Court just felt that we didn't need to put them on the record. . . ."[228] Our review of the record does not reveal a discernible impact on the proceedings nor can we discover any specific prejudice suffered by the defendant with regard to other unrecorded bench conferences. See Draughn, XXXX-XXXX p. 65, 950 So.2d at 626.[229]
With regard to missing transcripts or pretrial proceedings, the defense points to court dates which have no corresponding transcription in the appellate record. This court has previously held that where minute entries show relatively minor events, or where there are "gaps" in the record, such inconsequential omissions merit no relief. State v. LaCaze, XXXX-XXXX p. 17 (La.1/25/02), 824 So.2d 1063, 1076-1077, cert. denied, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002). We note that defense counsel has had the appellate record supplemented with the transcripts of certain pretrial hearings. Otherwise, appellate counsel does no more than raise *874 unsupported speculations which cannot stand as the basis for relief.
With regard to the transcription of the voir dire proceedings, we found no difficulty in determining the appropriateness of the cause challenges, which were the issues raised by the defendant on appeal.
Finding that none of the assignments of error raised by the defendant on appeal show reversible error, we now review the record to determine if the sentence of death imposed in this case is constitutionally excessive.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. Sup.Ct. Rule 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
In this case, the trial court submitted a Uniform Capital Sentence Report ("UCSR") and the Department of Public Safety and Corrections has submitted a Capital Sentence Investigation ("CSI"). In addition, the state filed a Sentence Review Memorandum and the defendant has filed a corresponding Reply Memorandum.
These documents, along with the penalty phase testimony of the defendant's relatives, indicate that the defendant is an African-American man who was born on February 21, 1983. The defendant grew up in Rodessa, Louisiana, and was ten days short of his 19th birthday at the time of the offense. The defendant has three siblings. He has never been married and has no children. The defendant's father, by whom he was primarily raised, died in 1998.
The records disagree as to the defendant's education. According to the UCSR, the highest grade the defendant completed in school was the 9th grade. According to the defendant's aunt, who answered questions for the CSI, the defendant finished the 9th grade before dropping out of school. According to the defendant in his Faretta colloquy, he claimed the highest grade he completed was the 10th grade. In the report completed by defense expert, Dr. Vigen, the defendant did not complete the 9th grade, but instead, the defendant left school during his third attempt to complete the 9th grade. The defendant received special education services while in school.
As for the defendant's work history, the defendant related several prior jobs in his Faretta colloquy, including working at a paper mill, saw mill and truck stop. The UCSR indicates the defendant never held a job. The CSI indicates the defendant never had full-time employment and was unemployed at the time of the offense.
The UCSR shows that the defendant had a prior criminal record. With regard to an aggravated battery occurring on February 11, 2001, the defendant pleaded guilty to simple battery and received a suspended sentence, unsupervised probation, and a fine. With regard to a misdemeanor theft charge, the defendant pleaded guilty and received a suspended sentence, unsupervised probation and a fine. The CSI confirms these prior adult convictions, and indicates that the defendant has a juvenile record, reporting arrests for the offenses of purse snatching, truancy, entering and remaining, driving without a license, and aggravated and simple criminal damage to property. The CSI shows, however, that the disposition *875 of these juvenile matters resulted in rejection of charges, adjudication as a delinquent, or probation.
According to the UCSR, the defendant's I.Q. is below 70, although that indication bears an asterisk with the further information that this is the result of preliminary testing and that the defendant refused further testing.

Passion, Prejudice, Arbitrary Factors
The defendant contends that his sentence is constitutionally excessive because: (1) substantial evidence indicates that the defendant suffers from mental retardation; (2) there were violations of his right to due process and a fair trial; and (3) the defendant bears reduced moral culpability arising from his age and mental deficiencies. All of these factors were treated in depth in the individual assignments of error raised by the defendant.
Otherwise, we note that this was a trial of a young, African-American man accused of killing a 51-year old Caucasian woman during an armed robbery. The record reveals no evidence of prejudice, as race was not raised as an issue at trial. Both the defendant and the victim were local residents in a small community. The UCSR indicates that the jury which unanimously found the defendant guilty of first degree murder and sentenced him to death was composed of eleven white jurors and one black juror. The UCSR states that there was no extensive publicity in the community concerning this case.
We find no evidence that the sentence was imposed due to passion, prejudice or other arbitrary factors.

Aggravating Circumstance
At trial, the state argued one aggravating circumstance: that the defendant was engaged in the perpetration of an armed robbery when he murdered the victim. See La.C.Cr.P. art. 905.4(1). The jury found the existence of this circumstance. The state's evidence was so strong that sufficiency of the evidence has not been raised on appeal. Nevertheless, we find that the state's evidence, consisting as it did of a surveillance videotape and eyewitness testimony was sufficient beyond a reasonable doubt to support the jury's determination in this regard.

Proportionality
Although the federal constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 7 (La.1979).
The state's Sentence Review Memorandum reveals that since 1976, jurors in the First Judicial District have returned a guilty verdict in 41 capital cases, including the defendant's case, and of those, juries have recommended imposition of the death penalty 16 times.[230] Of those 16 cases in *876 which the juries have recommended death, 14 found as one of their aggravating circumstances that the offender was engaged in the perpetration or attempted perpetration of an armed robbery.[231] Six juries, including the defendant's, returned a death sentence based on the sole aggravating factor that the offender was engaged in the perpetration or attempted perpetration of an armed robbery.[232] A comparison of this case to other first degree murder cases in Louisiana as a whole reveals the cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery or an attempted armed robbery. See e.g. State v. Williams, XXXX-XXXX (La.1/21/98), 708 So.2d 703, cert. denied, 525 U.S. 838, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998); State v. Scales, 1993-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996).
A comparison of this case with other first degree murder cases in the First Judicial District where death was imposed, as well as with other first degree murder cases in Louisiana as a whole where the same aggravating circumstance was found, convinces this court that the death sentence imposed in this case is not a disproportionately harsh sentence, considering the offense and the offender.

DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana *877 Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
CALOGERO, Chief Justice, dissents and assigns reasons.
JOHNSON, Justice, dissents and assigns reasons.
CALOGERO, Chief Justice, dissents and assigns reasons.
I respectfully dissent from the majority decision affirming the conviction and sentence of death. I disagree with the majority's resolution of the defendant's claim that the trial court abused its discretion in denying a challenge for cause against juror Jerry Payne, who was empaneled on the petit jury, on the basis that Payne would place upon the defense the improper burden of proving the existence of mitigating circumstances beyond a reasonable doubt. The record of the voir dire examination does not expose any rational basis for a finding that this juror could, under any particular circumstances, set aside his acknowledged presumption in favor of the death penalty and fairly consider imposing a sentence of life imprisonment. The majority thus errs in finding that this juror was not substantially impaired in the performance of his duties.
Although the majority opinion does not cite it in the discussion regarding juror Payne, the only Louisiana case that might arguably support the majority's rather facile conclusion that Payne's answers "negated the defense's inference that Payne was biased, prejudiced, or unable to render a judgment according to law," ante, p. 862, is State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845. In Lucky, the prospective juror would have required "some pretty heavy evidence" in mitigation to merit consideration of a sentence other than death. The Lucky court found no error in the denial of the challenge for cause because, the court opined, the trial judge there had "perceived [the juror's] responses to mean that his predisposition toward the death penalty, balanced with his willingness to consider mitigating circumstances and to credit those that he deemed `pretty heavy,' did not significantly impair [the juror's] performance of his duties as a juror in accordance with his instructions and his oath." 96-1687, p. 8, 755 So.2d at 851.
I believe Lucky was wrongly decided, as I explained in my dissent to the denial of the rehearing in that case. Lucky, 96-1687, 755 So.2d at 861, Calogero, C.J., dissenting from the denial of rehearing. Because the legislature did not provide any presumptions or fixed standards for a capital sentencing jury to use in considering aggravating and mitigating circumstances, that body intended that a qualified juror not enter the penalty phase of trial with a presumption that death is the appropriate penalty, a presumption the defendant would necessarily bear the burden of overcoming. Id. In Lucky, I stated that any juror who would begin the penalty phase with a presumption of death, unless "heavy" evidence in mitigation were presented, is unfit to serve on a capital jury, just as would a juror who would begin the penalty phase of the trial with a presumption that life is the appropriate penalty. Id.
In my view, the instant case presents a juror even less willing to consider mitigating circumstances than was found in Lucky. Here, when Payne was first asked about his willingness to consider mitigating *878 circumstances, he stated: "I'll say this, if there are any mitigating factors that affect me, they're going to really have some strong evidence [sic] to prove to me that those things are a factor." R. vol. 6, p. 15. Although Payne did respond affirmatively when asked if he could consider a life sentence, his actual statements otherwise demonstrate that he would hold the defendant to a burden of proof not required by our law. Counsel explained that when the jury reached the penalty phase, the defendant would have already been found guilty of armed robbery and intentional murder: "So, if we reach the penalty phase it's because that [the defendant meant to do the killing] is a foregone conclusion." Id., p. 34. Juror Payne explained at length the need for death as a possible punishment, especially when the killing was intended: "They meant to do it, then I think the death penalty is appropriate. If they have enough faculties about them and their thought process to know that they're intending to do it, then I think the death penalty is appropriate." Id., pp. 41-42.
When told again that guilt of armed robbery and an intentional killing will be a foregone conclusion when the penalty phase is reached and then asked if he would consider himself "in the middle" with regard to the sentences of death or life, the following exchange occurred:
A: That's fully hard to answer that [sic] because I don't know the real facts of the case.
Q: I understand. And I don't want to put you on the spot but I'm just trying to 
A: I'm open to anything, okay. But it's going to be very difficult. Again, I once said during the mitigating, if you use mitigating circumstances with me, you're going to have to prove them beyond a really reasonable doubt. I mean, I hear a doctor come in and say the person is mentally ill, you're going to have to make me understand that really good for me to accept that.
Q: If the judge were to tell you that you must consider any evidence that proves a mitigating circumstance, even if it's far less than beyond a reasonable doubt, could you consider it?
A: The judge would ask me to do what with that evidence?
Q: Consider any mitigating circumstance evidence?
A: Yes, I would consider it.
Q: Now, in terms of considering it, could you use a mitigating circumstance that has not been proven beyond a reasonable doubt as an actual reason for imposing a life sentence?
A: I'd just have to see the situation. I don't know that I could do that.
Q: So the answer is it would depend?
A: It sure would.
Q: If I understood your answer before that, you would want to see them prove beyond a reasonable doubt before it would have any impact on you?
A: Before it would make certain that I would give them life rather than death.
Q: Okay. You would expect that level of proof?
A: Absolutely.
R. vol. 6, pp. 43-44.
Mr. Payne was never rehabilitated after this exchange on the burden of proof that he would impose on the defendant before he would consider a life sentence, nor was he even questioned about the burden of proof. See R. vol. 6, pp. 44-46, 48-49, and *879 58-59. Indeed, in response to general questions about a life sentence, Payne later reiterated that, though he acknowledged being able to consider life imprisonment, "it has to be a pretty good standard for me to get out of the death penalty, assuming the kinds of crime that I have discussed previously about the brutality, the savagery, the callousness, the intent, the meanness. Mitigating circumstances are going to have to prove to me that life imprisonment is deserving." Id., p. 49. While that statement in and of itself may not warrant removal, it is clear from reading the record on voir dire as a whole that this juror, before he would consider returning a life sentence, would place upon the defendant an improperly onerous burden of proof with regard to mitigating circumstances to overcome the juror's presumption in favor of the death sentence.
Furthermore, while the juror could easily describe the situations in which he would impose the death penalty, see R. vol. 6, pp. 41-43 and 44-45, he could not state with any particularity under what circumstances he might consider a life sentence. He indicated that, where there was intent to kill and a single gunshot, it would be "hard" to overcome the death penalty. See Id., pp. 41-42. He also indicated that if the killing were "brutal," he would have "no reservations" in imposing the death penalty, stating that "it's very hard to be reasonable when it's a brutal situation." Id., pp. 41 and 42. Payne then referred with approval to the statement of another prospective juror, Leland McNabb, who was eventually removed for cause, who had described as brutal every murder he had seen in his 25 years as a paramedic.[1] Payne agreed with McNabb, stating: "Well, every murder is brutal, he said that and that's exactly right." Id., p. 42. Finally, Mr. Payne explained that a life sentence without benefit of parole serves no useful purpose because the only reason for sending someone to prison "is so we can redeem them. And if you're sending them for life with no parole, redemption is not necessary because they're not ever going to get out anyway." Id., p. 44.[2]
Defense counsel challenged Mr. Payne for cause on the basis that he would require the defense to prove mitigating circumstances beyond a reasonable doubt, a burden of proof not provided by law. The State argued that Payne did not say such evidence would have to be proven beyond *880 a doubt, only that he would have to be strongly convinced by mitigating factors. The trial judge denied the challenge without reasons. On this record, I believe the trial judge could not have reasonably found that this juror's clear and admitted presumption in favor of the death penaltya presumption that was not tempered by any demonstrated willingness to consider mitigating circumstances as directed by our lawdid not substantially impair his ability to sit as a fair-minded and impartial juror during the penalty phase.
Moreover, I believe there should be a level playing field for the accused and the state in jury selection in capital cases. In this case, the majority found that the trial judge had properly excused on the state's challenge for cause prospective juror Rosie Lee. The majority reasons, "Lee's admission that she would consider the death penalty under certain extreme circumstances is outweighed by her consistent statements during the majority of voir dire that she would not impose the death penalty under any circumstance." Ante, p. 864. That same rationale should have applied to the majority's treatment of the defendant's challenge for cause of juror Payne. Payne repeatedly expressed his presumption in favor of the death penalty and his unwillingness to even consider a life sentence unless the defendant proved the existence of mitigating circumstances "beyond a really reasonable doubt." Therefore, this juror's mere acknowledgment that he could consider a life sentence was surely "outweighed" by his consistently strong statements during the majority of voir dire that the death penalty was the "appropriate" sentence for this crime and that he would hold the defendant to an improperly onerous burden of proof to overcome that presumption. Thus, had the trial judge and the majority today applied the law evenhandedly, in my view, both would have found that juror Payne was no more qualified to sit on the jury than was prospective juror Lee.
For these reasons, I believe the trial court abused its admittedly broad discretion in denying the defendant's challenge for cause against juror Payne, resulting in reversible error. Accordingly, I would order a new trial.
JOHNSON, J., dissents and assigns reasons:
I respectfully dissent. This trial was conducted by an experienced trial judge, who, after the jury was sworn, and on the third day of voir dire, was faced with the issue of whether the defendant was competent to proceed. On the fifth day of voir dire, the defendant asserted his Sixth Amendment right to self representation and the court was forced to determine the issue of whether defendant was competent to make a knowing waiver of his right to counsel.
Defendant made three substantial and interrelated arguments regarding his mental competency. The first issue was whether the trial judge was presented with evidence that defendant lacked the capacity to proceed, and whether the court failed to take adequate steps to determine the defendant's competency. One could argue that defendant's behavior before and during the trial indicated that his competence to stand trial was questionable. Specifically, the defendant exhibited a seemingly paranoid and delusional fixation that his court appointed attorneys, along with the district attorney, and other individuals present in the courtroom were making hand gestures and facial expressions to prospective jurors and jury members in an attempt to "coerce" them, or turn them against him. Had defendant exhibited the same delusions or paranoia pre-trial, the trial court would have had ample opportunity *881 to appoint a sanity commission. Defense counsel suggests that at the very least, the court was required to summon a physician for the purpose of determining whether defendant was competent to proceed. Despite the defendant's assertions, the defense failed to file any motions addressing these issues, and the trial court failed to conduct any pre-trial hearings or make any determinations on these issues.
Whether defendant lacked the capacity to proceed.
The procedure for raising the issue of a defendant's competency is set forth in LSA-C.Cr.P. art. 642:
The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except for the institution of prosecution, until the defendant is found to have the mental capacity to proceed.
Similarly, LSA-C.Cr.P. art. 643 charges the trial court with the responsibility of ordering a mental examination of a defendant "when it has reasonable ground to doubt the defendant's mental capacity to proceed." State v. Bibb, 626 So.2d 913 (La.App. 5 Cir.1993), writ denied, 93-3127 (La.9/16/94), 642 So.2d 188.
In State v. Bickham, 404 So.2d 929, 934 (La.1981), this Court stated:
Mental incapacity to proceed exists when, as a result of mental disease or defect, a defendant lacks the capacity to understand the proceedings against him or to assist in his defense. LSA-C.Cr.P. art. 641. The defendant bears the burden of establishing that he lacks the capacity to understand the object, nature and consequences of the proceedings against him and that he is unable, in a rational as well as factual manner, to consult with counsel in a meaningful way. State v. Hamilton, 373 So.2d 179 (La.1979).
Waiver of Right to Assistance of Counsel
Heretofore, the standard of competency for waiving the right to counsel has been the same as the standard of competency to stand trial. The trial court must satisfy itself that the waiver of rights is knowing and voluntary. The assertion of the right must also be clear and unequivocal. Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); State v. Hegwood, 345 So.2d 1179, 1181-82 (La.1977). "Whether an accused has knowingly and intelligently waived his right to counsel depends on the facts and circumstances of each case." State v. Strain, 585 So.2d 540, 542 (La.1991)(citing Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).
In Faretta, the Supreme Court recognized that a trial court may not force a lawyer upon a defendant when the defendant insists he wants to conduct his own defense, and voluntarily, and intelligently elects to proceed without counsel. However, defendant must assert his right clearly and unequivocally to proceed, pro se, and he must also make his request in a timely manner. Id., 422 U.S. at 835, 95 S.Ct. at 2541 ("Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel.") Faretta made clear that the accused's "technical legal knowledge, as such, [is] not relevant to an assessment of his knowing exercise of the right to defend himself." Faretta, 422 U.S. at 836, 95 S.Ct. at 2541; see also State v. Santos, 99-1897, p. 3 (La.9/15/00), 770 So.2d 319, 321 ("A trial judge confronted with an accused's unequivocal request to represent himself need determine only *882 whether the accused is competent to waive counsel and is `voluntarily exercising his informed free will.'")(quoting Faretta, 422 U.S. at 835, 95 S.Ct. at 2541).
In Indiana v. Ahmad Edwards, ___ U.S. ___, 128 S.Ct. 741, 169 L.Ed.2d 579, (2007), a case recently argued before the United States Supreme, but still undecided, the parties suggest that Faretta and its progeny, has resulted in a lack of clarity in the trial courts.[1]
The current rule seems to require the trial court to allow self-representation, then "wait and see" whether a defendant, who has total ignorance of evidentiary rules, or details for conducting a trial, can actually formulate a coherent defense. The public is entitled to see a judicial system that is adversarial, yet reliable. The court's role is to ensure that what plays out before a jury does not become a farce. The appointment of stand-by counsel does not seem to be effective; by the time the defendant evokes his right to counsel, the damage has been done. Standby counsel cannot effectively take over the remainder of the trial. The usual recourse is a mistrial.
The current Faretta rule often results in a waste of the court's resources. Competency is not a unitary concept. A defendant may be competent to understand and assist appointed counsel, but may not be competent to represent himself.
Mental Retardation for Purposes of Death Penalty (Atkins)
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that execution of mentally retarded persons constitutes an excessive punishment, and thus violates the Eighth Amendment. In the present case, the defendant contends that the record provides reasonable grounds to suspect that he is mentally retarded and exempt from execution. Based upon the limited medical and psychological information in the record, due partly to the defendant's refusal to cooperate with evaluators, the defendant requests that the issue be remanded to the trial court for a determination of whether he is mentally retarded. The State also concedes that this record, alone, is insufficient to make a determination of mental retardation.
It would be premature for this Court to make a determination of whether this defendant is mentally retarded and exempt from capital punishment based solely upon the record in this appeal. Although Atkins prohibits the States from executing mentally retarded persons, Atkins left to the States the task of developing guidelines for implementation. This Court responded to the Atkins mandate in State v. Williams, XXXX-XXXX (La.11/1/02), 831 So.2d 835, where we held that the determination of a defendant's mental retardation was an issue for the court to decide. We noted that the specifics of remanding a case on an Atkins claim was res nova in Louisiana, and in the interim between our decision in Williams and legislative action on the subject, we instructed trial courts to treat the issue procedurally as they would *883 treat pre-trial competency hearings, for which statutory criteria already existed. Williams, 831 So.2d at 858.
Following Williams, the Louisiana legislature enacted LSA-C Cr. P. art. 905.5.1, which prohibits the execution of the mentally retarded, provides procedures for raising and trying the issue, and defines mental retardation for the purpose of exemption from capital punishment. LSA-C. Cr. P. art. 905.5.1 reflects the legislature's preference that a jury determine all issues relevant to a capital sentencing determination in a single proceeding.[2]
In State v. Dunn, XXXX-XXXX (La.1/25/08), 974 So.2d 658, this Court held that La. C. Cr. P. art. 905.5.1 does not apply to cases in a post-verdict, post-conviction posture. We held that because the legislature has not established a procedure to be used for Atkins hearings conducted post-trial and/or post-sentencing, the state of the law for cases in a post-verdict posture is the same as it was at the time we issued our decision in Williams.
In Williams, this Court gave the following instructions to the trial courts:
As to the procedures to be used for post-Atkins hearings, we instruct the trial courts as follows: 1) to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has "reasonable ground" to believe a defendant is mentally retarded, LSA-C.Cr.P. art. 643; 2) to hold the hearing before a judge, not a jury; and 3) to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, LSA-28:381.
Like Dunn, this case is in a post-verdict procedural posture. Thus, the procedure outlined in Williams must be used by the trial court to determine whether Mr. Campbell is mentally retarded.

CONCLUSION
For the reasons assigned, I am unable to affirm the defendant's conviction and sentence. I would order this case remanded to the district court to conduct an evidentiary hearing to determine whether the defendant is mentally retarded and whether the defendant was competent to waive his right to counsel.
NOTES
[1] The defendant's name is spelled in a variety of ways throughout documents in the record. For purposes of consistency, the opinion will use the spelling utilized by the defendant in signing pro se documents and in school records.
[2] La. Const. art. 5, § 5(D) provides in pertinent part:

(D) Appellate Jurisdiction. In addition to other appeals provided by this constitution, a case shall be appealable to the supreme court if . . . (2) the defendant has been convicted of a capital offense and a penalty of death actually has been imposed.
[3] Testimony in the record explains that the Magnolia Club was so close to the Louisiana-Texas border that locals sometimes referred to it as "the Line."
[4] It is possible the witness meant "manic depressive".
[5] The defendant was born on February 21, 1983; thus, at the time of the February 11, 2002 murder, the defendant was 10 days away from his 19th birthday.
[6] La.C.Cr.P. art. 905.5.1 provides:

Art. 905.5.1. Mental retardation
A. Notwithstanding any other provisions of law to the contrary, no person who is mentally retarded shall be subjected to a sentence of death.
B. Any capital defendant who claims to be mentally retarded shall file written notice thereof within the time period for filing of pretrial motions as provided by Code of Criminal Procedure Article 521.
C. (1) Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone.
(2) Any pretrial determination by the judge that a defendant is not mentally retarded shall not preclude the defendant from raising the issue at the penalty phase, nor shall it preclude any instruction to the jury pursuant to this Section.
D. Once the issue of mental retardation is raised by the defendant, and upon written motion of the district attorney, the defendant shall provide the state, within time limits set by the court, any and all medical, correctional, educational, and military records, raw data, tests, test scores, notes, behavioral observations, reports, evaluations, and any other information of any kind reviewed by any defense expert in forming the basis of his opinion that the defendant is mentally retarded.
E. By filing a notice relative to a claim of mental retardation under this Article, the defendant waives all claims of confidentiality and privilege to, and is deemed to have consented to the release of, any and all medical, correctional, educational, and military records, raw data, tests, test scores, notes, behavioral observations, reports, evaluations, expert opinions, and any other such information of any kind or other records relevant or necessary to an examination or determination under this Article.
F. When a defendant makes a claim of mental retardation under this Article, the state shall have the right to an independent psychological and psychiatric examination of the defendant. A psychologist conducting such examination must be licensed by the Louisiana State Board of Examiners of Psychologists. If the state exercises this right, and upon written motion of the defendant, the state shall provide the defendant, within time limits set by the court, any and all medical, correctional, educational, and military records, and all raw data, tests, test scores, notes, behavioral observations, reports, evaluations, and any other information of any kind reviewed by any state expert in forming the basis of his opinion that the defendant is not mentally retarded. If the state fails to comply with any such order, the court may impose sanctions as provided by Article 729.5.
G. If the defendant making a claim of mental retardation fails to comply with any order issued pursuant to Paragraph D of this Article, or refuses to submit to or fully cooperate in any examination by experts for the state pursuant to either Paragraph D or F of this Article, upon motion by the district attorney, the court shall neither conduct a pretrial hearing concerning the issue of mental retardation nor instruct the jury of the prohibition of executing mentally retarded defendants.
H. (1) "Mental retardation" means a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
(2) A diagnosis of one or more of the following conditions does not necessarily constitute mental retardation:
(a) Autism.
(b) Behavioral disorders.
(c) Cerebral palsy and other motor deficits.
(d) Difficulty in adjusting to school.
(e) Emotional disturbance.
(f) Emotional stress in home or school.
(g) Environmental, cultural, or economic disadvantage.
(h) Epilepsy and other seizure disorders.
(i) Lack of educational opportunities.
(j) Learning disabilities.
(k) Mental illness.
(l) Neurological disorders.
(m) Organic brain damage occurring after age eighteen.
(n) Other handicapping conditions.
(o) Personality disorders.
(p) Sensory impairments.
(q) Speech and language disorders.
(r) A temporary crisis situation.
(s) Traumatic brain damage occurring after age eighteen.
[7] As stated previously, the defendant represented himself during the guilt phase portion of trial; however, the defendant requested that counsel represent him in the penalty phase.
[8] In his opening statement at penalty phase, defense counsel apologized to the jurors, then stated, "And you say why an apology? Because LaDerrick, on the night at the Magnolia Club, just as he fumbled in an armed robbery, and turned it into a very serious crime of first degree murder, he's fumbled his own defense." Vol. 12, p. 2466.
[9] See Vol. 5, p. 1013. As will be discussed in the section regarding the defendant's waiver of counsel at trial, the record shows the defendant and appointed counsel had a serious difference of opinion as to the proper defense strategy to pursue during the guilt phase. This conflict apparently also encompassed the proper strategy to pursue during the penalty phase. The record shows the defendant refused point-blank to participate in evaluations designed to determine whether he is mentally retarded.
[10] Dr. Vigen's letter indicates that on 11 attempts to interview and test the defendant, the defendant refused testing on 8 occasions. The defendant permitted only a one hour interview on one date and a ½ hour interview on another date. Only once, on April 26, 2004, did the defendant cooperate with evaluators; at that time he completed the Minnesota Multiphasic Personality Inventory-2, the Wechsler Adult Intelligence Scale-III and two tests of court competency. Vol. 3, p. 533.
[11] See Vol. 4, p. 800.
[12] The defense provided the documents relied upon herein in response to the state's motion for discovery. See Vol. 3, p. 623-627; Vol. 4, p. 628-800.
[13] Outside the presence of the jury, the prosecutor stated on the record the fact that the state's expert examined the data pertaining to Dr. Vigen's testing of the defendant, Dr. Vigen's report and the defendant's school records. According to the prosecutor, without discussing specific tests and without the opportunity to evaluate the defendant himself, the state's expert indicated in a telephone conversation with the prosecutor that the expert did not believe that malingering was an issue in this case. See Vol. 11, p. 2317.
[14] Vol. 3, p. 624-627.
[15] Since the defendant was almost 19 years old at the time of the offense, his school records reflected assessments of him which were fairly recent in time to the crime.
[16] An assessment made while the defendant was in the sixth grade noted: "LaDerrick can be very disruptive in class. He does not respect authority figures and at times is very noncompliant with adults. His peer relationships have improved but at times he disrupts the class by making fun of other students and irritating his peers. LaDerrick can be very well-mannered when he wants to or wants you to do something for him. He is very manipulative in this manner. When he becomes disruptive, many times he cannot be reasoned with." Vol. 4, p. 777.
[17] Vol. 4, p. 751.
[18] Vol. 4, p. 763.
[19] Id.
[20] Vol. 4, p. 773.
[21] Vol. 12, p. 2513, 2517.
[22] Vol. 12, p. 2513.
[23] Vol. 12, p. 2517.
[24] Vol. 12, p. 2519-2520.
[25] Vol. 12, p. 2521.
[26] Vol. 12, p. 2523.
[27] State's brief, p. 11-12.
[28] Even if Dr. Vigen's findings of low I.Q. were not preliminary, this court has noted that "[a] low IQ may reflect one who is limited intellectually, but who nevertheless is not mentally retarded." Williams, XXXX-XXXX p. 23 n. 26, 831 So.2d at 853 n. 26.
[29] Reference is made to Dr. Vigen's report of August 24, 2004, in which he states "I suspect that Mr. Campbell has adopted a style of behavior which presents him as being socially acceptable and without mental defects. These factors argue in favor of Mr. Campbell being mentally retarded. . . . To some extent his uncooperativeness can be seen as either oppositionalism and defiance and/or some type of adaptive covering mechanism to hide his deficiencies." Vol. 3, p. 627.
[30] Defense counsel's decision not to introduce the evidence compiled in pretrial discovery may have been a strategic decision. If the evidence had been introduced, the evidence would no doubt have drawn the same criticisms raised by the state on appeal. In addition, the jurors had just seen the defendant conduct his own defense during the guilt phase at trial, where he made objections, cross-examined witnesses and made both opening statement and closing argument. Although the defendant's presentation may not have been as articulate and polished as one made by an attorney, he nevertheless presented a relevant defense.
[31] Considering the defendant's age, it is not unusual that he did not have vast work experience. We note also that the defendant testified to this prior work experience during his Faretta colloquy with the trial court.
[32] The defense also relies upon the adaptive behavior tests administered to the defendant's aunt and brother, which found the defendant's "mental age" was below that of his chronological age, in support of this argument.
[33] See Vol. 3, p. 625; Vol. 4, p. 643-650.
[34] Vol. 4, p. 799.
[35] See Motion to Appoint New Counsel, filed April 17, 2003, Vol. 2, p. 493; and Motion to Appoint New Counsel, filed August 26, 2003, Vol. 3, p. 508.
[36] Vol. 5, p. 959. Two attorneys from the indigent defender office were appointed to represent the defendant. The defendant appeared satisfied when the attorney who had not been the subject of his motion was designated as "lead counsel."
[37] Appointed defense counsel refused to adopt the defendant's pro se motions. Vol. 5, p. 956.
[38] Vol. 5, p. 960-971.
[39] Vol. 3, p. 530.
[40] Vol. 5, p. 974-975.
[41] Vol. 5, p. 976-977.
[42] Vol. 5, p. 977.
[43] Vol. 5, p. 977-978.
[44] Vol. 5, p. 983-1004.
[45] Vol. 5, p. 1006-1009.
[46] Vol. 5, p. 1012-1013.
[47] Vol. 5, p. 1014-1015.
[48] Vol. 5, p. 1008.
[49] Vol. 5, p. 1026.
[50] The trial court told the defendant that, once he saw that the trial court noticed his upraised hand, he could put his hand down. The trial court informed the defendant that he would give the defendant an opportunity to speak, just as the trial court always had in the past. Vol. 5, p. 1026-1027.
[51] Vol. 5, p. 1027-1028.
[52] Vol. 5, p. 1028.
[53] Vol. 5, p. 1028-1031.
[54] Vol. 5, p. 1032-1039.
[55] Vol. 6, p. 1323-1324, 1332.
[56] Vol. 7, p. 1336-1338.
[57] Vol. 7, p. 1339.
[58] Vol. 7, p. 1340.
[59] Vol. 7, p. 1341.
[60] Vol. 7, p. 1343.
[61] Vol. 7, p. 1347.
[62] Vol. 7, p. 1348.
[63] Id.
[64] Vol. 7, p. 1411.
[65] Vol. 7, p. 1411-1414.
[66] Vol. 7, p. 1414.
[67] Vol. 7, p. 1415.
[68] Vol. 7, p. 1415-1416.
[69] Vol. 7, p. 1417.
[70] As far as court observations, defense counsel later amended his presentation to include the defendant's claim that prospective jurors were making signals. Defense counsel placed on the record his own observation that the prospective jurors were not signaling, but that the defendant gesturing and pointing caused the prospective jurors to look at counsel table more. Vol. 7, p. 1420.
[71] Vol. 7, p. 1418-1419.
[72] Vol. 7, p. 1419.
[73] Vol. 7, p. 1420-1421.
[74] Vol. 7, p. 1421.
[75] Id.
[76] Vol. 8, p. 1730-1736.
[77] Vol. 8, p. 1740-1743.
[78] Vol. 8, p. 1749-1755.
[79] Vol. 8, p. 1756.
[80] Vol. 8, p. 1757-1758.
[81] Vol. 8, p. 1759.
[82] Vol. 8, p. 1760.
[83] Id.
[84] Id.
[85] Vol. 8, p. 1778.
[86] Id.
[87] Vol. 8, p. 1779.
[88] Id.
[89] Vol. 8, p. 1779-1780.
[90] Vol. 8, p. 1786-1790.
[91] Vol. 8, p. 1793.
[92] Vol. 9, p. XXXXXX-XXXX.
[93] Vol. 9, p. 1798.
[94] At the lunch recess, the trial court indicated on the record that the defendant had obtained the court's attention during portions of the voir dire. After conferring with defense counsel, defense counsel indicated to the court that the defendant had an issue he wanted defense counsel to handle when he spoke to the prospective jurors during voir dire. The defendant had nothing at that time that he wished to tell the trial court. Vol. 9, p. 1866.
[95] Vol. 9, p. 1867-1868.
[96] Vol. 9, p. 1900.
[97] Id.
[98] Vol. 9, p. 1901.
[99] Vol. 9, p. 1901-1906.
[100] Vol. 9, p. 1906-1908.
[101] Vol. 9, p. 1908-1925.
[102] Vol. 9, p. 1925-1932.
[103] Although defense counsel argues that the defendant's transcribed response of "seven, twenty-first, 83" was incorrect, and thus serves as evidence of the defendant's lack of competency, the state contends that the defendant's answer was mis-transcribed. The state argues the defendant's response was probably "second, twenty-first, 83", since the defendant was using ordinal numbers for dates. We note that the birth certificate introduced by the defense during penalty phase indicates the defendant's birth date as February 21, 1983.
[104] Vol. 9, p. 1933-1934.
[105] Vol. 9, p. 1935.
[106] Vol. 9, p. 1935-1937.
[107] Vol. 9, p. 1937-1938.
[108] Vol. 9, p. 1939-1940.
[109] Vol. 9, p. 1940-1942.
[110] Vol. 9, p. 1943.
[111] Vol. 9, p. 1945.
[112] Vol. 9, p. 1946-1947.
[113] Vol. 9, p. 1947.
[114] Vol. 9, p. 1948.
[115] Vol. 9, p. 1949-1950.
[116] Vol. 9, p. 1950.
[117] Vol. 9, p. 1950-1953.
[118] The closed hearing was transcribed and filed as a sealed part of the record. The pagination of the closed hearing follows that of the transcript of proceedings in open court. Therefore, citation in this opinion will contain both the volume number and page number that the closed hearing would have in the record.
[119] Vol. 9, p. 1954-1956.
[120] Vol. 9, p. 1956-1957.
[121] Vol. 9, p. 1957.
[122] Vol. 9, p. 1958.
[123] Id.
[124] Vol. 9, p. 1959-1960.
[125] Vol. 9, p. 1961-1962.
[126] Vol. 9, p. 1962-1963.
[127] Vol. 9, p. 1963-1970.
[128] Vol. 9, p. 1964-1965.
[129] Vol. 9, p. 1966-1967.
[130] Vol. 9, p. 1968-1969.
[131] Vol. 9, p. 1969-1970.
[132] Vol. 9, p. 1970.
[133] Vol. 10, p. 1976-1979.
[134] Vol. 10, p. 1979-1981.
[135] Vol. 10, p. 1981-1987.
[136] Vol. 10, p. 1987.
[137] Id.
[138] Id.
[139] Vol. 10, p. 1987-1990.
[140] Vol. 10, p. 1990-1991.
[141] Vol. 10, p. 1991-1995.
[142] Vol. 10, p. 1996.
[143] Vol. 10, p. 1997-1998.
[144] Vol. 11, p. 2337-2343.
[145] Vol. 11, p. 2350.
[146] Vol. 11, p. 2437.
[147] Vol. 12, p. 2445.
[148] On August 3, 2006, appellate defense counsel filed a motion to remand for a nunc pro tunc determination of the defendant's competence to stand trial. The motion was referred to the merits of the appeal on August 14, 2006. Considering our determination that there was no abuse of the trial court's discretion in failing to appoint a sanity commission, either on defense counsel's motion or on its own motion, we find this motion to be moot.

Thereafter, on August 29, 2006, appellate defense counsel filed a motion to have the defendant examined with regard to his competency to proceed on appeal. The court denied the motion on September 1, 2006.
[149] We are aware that the United States Supreme Court has granted certiorari and heard oral argument in the case of Indiana v. Edwards, 07-208. However, the question presented in Edwards is whether a state may impose a higher standard: "May a criminal defendant who, despite being legally competent, is schizophrenic, delusional, and mentally decompensatory in the course of a simple conversation, be denied the right to represent himself at trial when the trial court reasonably concludes that permitting self-representation would deny the defendant a fair trial." The State of Indiana required a criminal defendant who requested self-representation to meet a higher standard of competency than the standard of competency for proceeding to trial. Louisiana does not impose a higher standard; thus, we do not believe the Court's holding in Edwards will impact our decision here. In the event that the Court overrules its previous holding in Godinez, however, the defendant will be permitted to raise the issue, depending on when Edwards is rendered, either on rehearing or in post-conviction.
[150] La.C.Cr.P. art. 841(A) provides in pertinent part: "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. . . . ".
[151] Although Detective Bradford testified that he received information from eyewitnesses of the description of the two men who entered the Magnolia Bar, he did not testify as to what those descriptions were. Instead, he testified that the descriptions led him to suspect the defendant based on his own personal knowledge of the defendant's physical characteristics. The officer's personal knowledge of the defendant's physical characteristics was then augmented by his viewing of the surveillance videotape, which led to the arrest warrants for the defendant and James Washington.
[152] La.C.Cr.P. art. 774 provides in pertinent part: "The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case."
[153] This emerging aspect of the court's jurisprudence bears directly on defendant's complaints with regard to rulings by the trial court denying his cause challenges to prospective jurors Debra Roberts, Jerry Payne, and Daniel Jarosek. Roberts was ultimately removed by backstrike from the panel after initially surviving the first round of peremptory challenges. Payne ultimately served on the jury, and the defendant accepted him at a time when he still had virtually a full complement of peremptory challenges to exercise. The record shows that Payne appeared in the first twelve jurors submitted for final selection, sandwiched in between the defendant's first and second peremptory strike. On the other hand, it appears that defendant had already exhausted his peremptory challenges by the time Jarosek came up for selection. The difficulty in determining the exact timing of the peremptory strikes is due to the fact that both sides exercised their strikes simultaneously in the final selection process. The original record did not indicate which side struck which juror. Supplementation of the record required a comparison of the original record with the supplemental record. At any rate, as discussed infra, no error is perceived in the trial court's rulings as to these jurors.
[154] Vol. 5, p. 1076.
[155] Vol. 5, p. 1077.
[156] Id.
[157] Vol. 5, p. 1105.
[158] Id.
[159] Id.
[160] Vol. 5, p. 1109.
[161] Vol. 6, p. 1144.
[162] Vol. 6, p. 1144-1145.
[163] Vol. 6, p. 1145.
[164] Id.
[165] Id.
[166] Vol. 6, p. 1146.
[167] Vol. 6, p. 1161.
[168] Vol. 6, p. 1171.
[169] Vol. 6, p. 1171-1172.
[170] Vol. 6, p. 1172.
[171] Id.
[172] Id.
[173] Vol. 6, p. 1173.
[174] Id.
[175] Id.
[176] Vol. 6, p. 1173-1174.
[177] Vol. 6, p. 1174.
[178] Id.
[179] Id.
[180] Id.
[181] Id.
[182] Vol. 6, p. 1175.
[183] Id.
[184] Vol. 6, p. 1179.
[185] Id.
[186] Vol. 6, p. 1195.
[187] Vol. 6, p. 1197.
[188] Vol. 9, p. 1892.
[189] Vol. 9, p. 1885.
[190] Vol. 9, p. 1886.
[191] Vol. 9, p. 1899.
[192] Vol. 9, p. 1914.
[193] Vol. 9, p. 1916-1918.
[194] Vol. 5, p. 1118.
[195] Vol. 5, p. 1056.
[196] Vol. 5, p. 1057.
[197] Vol. 5, p. 1073.
[198] Vol. 5, p. 1074.
[199] Vol. 5, p. 1094.
[200] Id.
[201] Vol. 5, p. 1095.
[202] Vol. 5, p. 1095.
[203] Vol. 5, p. 1119-1120.
[204] The prospective jurors are identified as Samuels, Pitts, Smith, Adams, Jacobs, League, Tucker, Glover, Thompson, Washington, Pratt, Abney, Holy, Daugherty, Ironsmith, Kennedy, Patterson, Baird, Madison, Edmiston. See Appellant's Brief, p. 65.
[205] See Vol. 6, p. 1197; Vol. 7, p. 1478, 1537; Vol. 8, p. 1781; Vol. 9, p. 1919.
[206] See Vol. 10, p. 2041, 2042.
[207] See Appellant's brief, p. 68.
[208] Vol. 7, p. 1449.
[209] Vol. 7, p. 1449-1450.
[210] Vol. 7, p. 1463.
[211] Vol. 7, p. 1463-1464.
[212] Vol. 7, p. 1465-1466.
[213] Vol. 8, p. 1721-1726, 1747-1749.
[214] Vol. 8, p. 1765-1766.
[215] Vol. 10, p. 2016.
[216] Id.
[217] Vol. 2, p. 334.
[218] Vol. 2, p. 323.
[219] Appellant's brief, p. 72.
[220] Vol. 5, p. 907.
[221] Vol. 5, p. 907.
[222] Vol. 5, p. 944.
[223] See Vol. 1, p. 12A.
[224] However, the defendant filed a pro se motion to quash based on an alleged violation of his right to a speedy trial. Vol. 4, p. 854.
[225] Vol. 1, p. 12.
[226] La.C.Cr.P. art. 801 provides in pertinent part:

* * *
C. A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.
[227] La.C.Cr.P. art. 905.2 provides in pertinent part:

* * *
B. Notwithstanding any provision to the contrary, the court shall instruct the jury that under the provisions of the state constitution, the governor is empowered to grant a reprieve, pardon, or commutation of sentence following conviction of a crime, and the governor may, in exercising such authority, commute or modify a sentence of life imprisonment without benefit of parole to a lesser sentence including the possibility of parole, and may commute a sentence of death to a lesser sentence of life imprisonment without benefit of parole. The court shall also instruct the jury that under this authority the governor may allow the release of any offender either by reducing a life imprisonment or death sentence to the time already served by the offender or by granting the offender a pardon. The defense may argue or present evidence to the jury on the frequency and extent of use by the governor of his authority.
[228] Vol. 8, p. 1704.
[229] We note parenthetically that the trial judge in Draughn was the same trial judge in this case. In Draughn, the trial judge placed on the record the normal procedure followed in his section of court, which consisted of placing into the record at the end of the day the objections he deemed substantive. The other objections, deemed non-substantive, were not separately placed on the record. We noted in Draughn only that the prosecutor and defense counsel appeared to acquiesce in the procedures, as had occurred in Hoffman, and found no prejudice. Here, we likewise find no objection and no prejudice.
[230] State v. Holmes, 2006-2988, appeal presently pending in this Court; State v. Coleman, XXXX-XXXX (same); State v. Campbell, XXXX-XXXX (present case); State v. Draughn, XXXX-XXXX (La.1/17/07), 950 So.2d 583; State v. Wilson, XXXX-XXXX (La.3/30/05), 899 So.2d 551 (death sentence vacated in light of Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) because Wilson was a minor at the time of the offenses; resentenced to life imprisonment without benefit of parole, probation or suspension of sentence); State v. Williams, XXXX-XXXX (La.11/1/02), 831 So.2d 835 (following an Atkins hearing, Williams was found to be retarded and was resentenced to life imprisonment without benefit of parole, probation or suspension of sentence); State v. Irish, 2000-2086 (La. 1/15/02), 807 So.2d 208, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); State v. Deal, XXXX-XXXX (La.11/28/01), 802 So.2d 1254, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002); State v. Edwards, XXXX-XXXX (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); State v. Hampton, XXXX-XXXX (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); State v. Cooks, XXXX-XXXX (La.9/9/98), 720 So.2d 637, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999); State v. Tyler, XXXX-XXXX (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999); State v. Davis, XXXX-XXXX (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. Code, 627 So.2d 1373 (La.1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); State v. Felde, 422 So.2d 370 (La. 1982), 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983); State v. Ford, 489 So.2d 1250 (La.1986).
[231] See Holmes, supra; Coleman, supra; Campbell, infra; Draughn, supra; Wilson, supra; Williams, supra; Irish, supra; Edwards, supra; Hampton, supra; Cooks, supra; Tyler, supra; Davis, supra; Code, supra; and Ford, supra.
[232] See Campbell, infra; Williams, supra; Irish, supra; Hampton, supra; Davis, supra; and Ford, supra.
[1] McNabb stated at the outset of the voir dire:

I think in my job that I've done the last 25 years I've seen a lot of murder cases. I mean I've actually seen the victim laying on the ground, in a car or a house or wherever. And all murders are brutal. Everyone kept on saying in here yesterday if it was brutal enough. Well, I can tell you right now, all murders are brutal no matter how they are done. And in my opinion, if there's enough evidence there that a man is guilty of first degree, then there's no other sentence but the death penalty on that. If you can convince me that the  if the defense attorney can convince me that now this is of a lesser crime, it's not a first degree murder, if it's a second degree or manslaughter type, then I can consider the life sentence. But I cannot consider that on a first degree murder that's been  that the jurors, myself and the other jurors have convicted this man he is guilty of first degree, then that's it for me, it's cut and dry.
R. vol. 6, p. 10.
[2] Payne later asked defense counsel to describe or define "hard labor" for a sentence of life imprisonment with hard labor in the custody of the Department of Corrections. He was apparently not satisfied with defense counsel's answer that the kind of labor might depend on the inmate's age, stating "What I have in mind, the old ball and chain gang where they're out cracking rocks." R. vol. 6, pp. 58-59. Counsel could not provide an answer when Payne asked, "Well, I'm concerned is that a real part of the punishment or not? Is it really hard labor or is it working in the laundry?" Id., p. 59.
[1] In Edwards, the defendant was arrested for shoplifting a pair of shoes. He allegedly drew and fired a gun, injuring an onlooker. The State court found the defendant was found not competent to stand trial, and ordered treatment for his psychosis. Five years following his arrest the defendant was declared competent to stand trial. At trial and a later retrial, the defendant sought to represent himself. The trial court denied the defendant's request to self-representation based on the defendant's lack of unspecified "abilities" needed for self representation. The Supreme Court of Indiana reversed, holding that denying the defendant the right to represent himself based on his lack of unspecified "abilities" violated the Sixth Amendment of the United States Constitution.
[2] Specifically, LSA-C.Cr.P.art. 905.5.1. provides, in pertinent part:

A. Notwithstanding any other provisions of law to the contrary, no person who is mentally retarded shall be subjected to a sentence of death.
B. Any capital defendant who claims to be mentally retarded shall file written notice thereof within the time period for filing of pretrial motions as provided by Code of Criminal Procedure Article 521.
C. (1) Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone.
(2) Any pretrial determination by the judge that a defendant is not mentally retarded shall not preclude the defendant from raising the issue at the penalty phase, nor shall it preclude any instruction to the jury pursuant to this Section.